James HILL, a/k/a Amin Khatib Muhammad, Appellee,

v.

David BLACKWELL and Donald Wyrick, Appellants.

No. 84–2258.

United States Court of Appeals, Eighth Circuit.

Submitted April 11, 1985.

Decided Oct. 10, 1985.

Rosalynn Van Heest, Asst. Atty. Gen., Jefferson City, Mo., for appellants.

Christopher C. Harlan, Kansas City, Mo., for appellee.

Before ARNOLD and FAGG, Circuit Judges, and HARPER,* Senior District Judge.

FAGG, Circuit Judge.

James Hill, an inmate at the Missouri State Penitentiary, brought suit under 42 U.S.C. § 1983 claiming that a prison grooming regulation prohibiting the growing of beards by prison inmates violates his first amendment right to exercise freely his religion. The district court agreed with Hill and thus enjoined enforcement of the regulation against Hill and other similarly situated inmates. We reverse.

## Facts

Hill is a member of the Muslim faith. The wearing of facial hair, including beards and moustaches, is a practice of the Muslim religion. A regulation promulgated by the Department of Corrections of the State of Missouri prohibits inmates in Missouri penal institutions, exclusive of certain minimum security facilities, from growing beards. The regulation provides:

> (2) The wearing of sideburns and mustaches will be permitted. Sideburns may not extend lower than the bottom of the ear, and mustaches will be no wider than the mouth. As beards can dramatically alter the inmate's appearance and, thereby, present serious identification problems, only inmates assigned to the State Correctional Pre-Release Center, Ka-Cee Honor Center, St. Mary's Honor Center, or a halfway house program will be permitted to grow beards. All inmates reassigned from any of these programs will be expected to shave their beard[s] and comply in all other respects with the grooming policy in effect at the institution to which they are reassigned.

After filing two grievances with the prison board in which Hill requested and was denied an exemption from the regulation on religious grounds, Hill filed this suit in district court. After an evidentiary hearing, the district court determined that Hill sincerely believed in the Muslim faith and that the "grooming regulation prohibiting beards is not reasonably and substantially justified by considerations of prison security and is, therefore, violative of the First Amendment's guarantees of religious freedom." Further, the district court stated that "[t]o the extent that the defendants have introduced evidence that the absence of the regulation would create a potential security risk, the Court concludes that there is substantial evidence that the defendants' claims of security risk are exaggerated."

On appeal, David Blackwell, director of the Missouri Department of Corrections, Division of Adult Institutions, and Donald Wyrick, warden of the Missouri State Penitentiary, defendants below, do not dispute that Hill's desire to grow a beard is founded upon a sincerely held religious belief. *See Quaring v. Peterson*, 728 F.2d 1121,

* The HONORABLE ROY W. HARPER, Senior United States District Judge for the Eastern and Western Districts of Missouri, sitting by designation.

1123 (8th Cir.1984), *aff'd by an equally divided Court sub nom. Jensen v. Quaring,* —— U.S. ——, 105 S.Ct. 3492, 86 L.Ed.2d 383 (1985). Rather, Blackwell and Wyrick maintain that the beard regulation is reasonably justified by legitimate concerns for prison security, and further that the prison officials' response to their legitimate concerns for prison security is not exaggerated. Based upon the record evidence, we agree with Blackwell's and Wyrick's contentions.

### Applicable Law

 It can no longer be questioned that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979). "Reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendments without fear of penalty." *Cruz v. Beto,* 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 1081 n. 2, 31 L.Ed.2d 263 (1972) (per curiam). "The fact of confinement and the needs of the penal institutions [do, however,] impose limitations on [the exercise of] constitutional rights, including those derived from the First Amendment, which are implicit in incarceration." *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 125, 97 S.Ct. 2532, 2537, 53 L.Ed.2d 629 (1977). "In sum, there must be [a] mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974).

The Supreme Court has considered a number of cases involving a conflict between constitutional rights and legitimate objectives of penal institutions. In *Procunier v. Martinez,* 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974), the Court recognized

> that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require

expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. * * * [W]here state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities.

At issue in *Martinez* was the constitutionality of a regulation concerning the censorship of prison inmates' mail. Contrary to the assumption of the parties involved, the Court concluded that the case did not require "an assessment of the extent to which prisoners may claim First Amendment freedoms." *Id.* at 408, 94 S.Ct. at 1809. Noting "that the First Amendment liberties of free citizens are implicated in censorship of prisoner mail," the Court looked "not to cases involving questions of 'prisoners' rights,' but to decisions of [the] Court dealing with the general problem of incidental restrictions on First Amendment liberties imposed in furtherance of legitimate governmental activities." *Id.* at 409, 94 S.Ct. at 1809. The Court then determined that censorship of prisoner mail is justifiable if "[f]irst, the regulation or practice in question * * * further[s] an important or substantial governmental interest unrelated to the suppression of expression" and "[s]econd, the limitation of First Amendment freedoms [is] no greater than is necessary or essential to the protection of the particular governmental interest involved." *Id.* at 413, 94 S.Ct. at 1811.

The same year, in *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2827, 41 L.Ed.2d 495 (1974), the Court considered a challenge to a prison regulation prohibiting face to face interviews between press representatives and individual inmates whom the press specifically name and request to interview. In response to the prisoners' claim that the regulation violated their first amendment rights to free speech, the Court noted that "[i]n the First Amendment context * * * a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legit-

imate penological objectives of the corrections system." *Id.* at 822, 94 S.Ct. at 2804. The Court recognized that "central to all other [penological objectives] is the institutional consideration of internal security within the corrections facilities themselves." *Id.* at 823, 94 S.Ct. at 2804. The Court then stated that considerations of institutional security "are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate the officials have exaggerated the response · to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Id.* at 827, 94 S.Ct. at 2806.

Following *Pell,* in *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977), the Court was faced with a claim by prison inmates that a prison regulation was infringing upon their first amendment rights to free speech, association, and assembly. Recognizing the difficulties inherent in running a penal institution, the Court again stressed the need to afford the decisions of prison officials "wide-ranging deference." *Id.* at 126, 97 S.Ct. at 2538.

After reiterating the testimony of prison officials supporting the need for the regulation, the Court in *Jones* noted that the district court had not rejected the prison officials' beliefs as fanciful or erroneous. *Id.* at 127, 97 S.Ct. at 2538. Rather, the Court noted, the district court determined that the beliefs were sincerely held and were arguably correct. *Id.* The Court then concluded that "[w]ithout a showing that [the] beliefs [of the prison officials as to the need for the regulation] were unreasonable, it was error for the District Court to conclude that [the prison officials] needed to show more." *Id.* at 127–28, 97 S.Ct. at 2538–39. Further, "the burden was not on [the prison officials] to show affirmatively that the [activity controlled by the regulation] would be 'detrimental to proper penological objectives' or would constitute a 'present danger to security and order.'" *Id.* (quoting *Jones,* 409 F.Supp. 937, 944–45 (E.D.N.C.1976)). Rather, "'[s]uch consid-

erations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.'" *Id.* 433 U.S. at 128, 97 S.Ct. at 2539 (quoting *Pell,* 417 U.S. at 827, 94 S.Ct. at 2806).

In *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Court again repeated a number of its previous pronouncements respecting resolution of conflicts between legitimate penological objectives and constitutional rights. The Court stressed the importance of according to prison officials "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security," *id.* at 547, 99 S.Ct. at 1878, and concluded that the inmates involved "simply [did] not [meet] their heavy burden of showing that [the prison] officials have exaggerated their response to the genuine security considerations that actuated [the] restrictions and practices," *id.* at 561–62, 99 S.Ct. at 1885–86.

This circuit has also ruled in a number of cases involving a conflict between a prisoner's first amendment rights and legitimate penological objectives. In *Teterud v. Burns,* 522 F.2d 357 (8th Cir.1975), a prison inmate successfully challenged on first amendment free exercise grounds a prison regulation prohibiting him from wearing long braided hair. While recognizing that decisions of the prison officials are entitled to deference, this circuit stated that "a regulation which is more restrictive than necessary to meet the institutional objectives or which does not serve the objectives advanced will be struck down." *Id.* at 359.

In *Teterud,* we noted that the only reason advanced by the prison officials in support of the regulation prohibiting the wearing of long hair was the warden's opinion "that the hair net and reidentification re-

quirements necessitated by allowing long hair would create a 'hassle' between correction officers and inmates." *Id.* at 361. Thus, on the record in *Teterud* the warden's justification for the regulation was not founded on a legitimate concern for prison security, and there was no need to decide whether the prison officials had exaggerated their response to a legitimate security consideration.

Following *Teterud*, in *Rogers v. Scurr*, 676 F.2d 1211 (8th Cir.1982), this circuit was again confronted with a challenge to a prison regulation on the grounds that it violated the inmates' rights under the free exercise of religion clause of the first amendment. Muslim inmates were challenging, among other things, a prison policy prohibiting them from wearing caps and robes outside prayer services. Prison officials testified that the policy was necessary because the wearing of caps and robes makes it too easy to conceal contraband. Having the benefit of the Supreme Court's decisions not only in *Pell* and *Martinez*, but also in *Jones* and *Bell*, we expressed our belief that the prison officials' explanation of the purpose for their policy was "eminently reasonable" and noted that "when the maintenance of institutional security is at issue, prison officials ordinarily must have wide latitude within which to make appropriate limitations." *Id.* at 1215.

Finally, in *Otey v. Best*, 680 F.2d 1231 (8th Cir.1982), this circuit considered a challenge to a prison regulation prohibiting inmates in administrative segregation and subject to the death penalty from attending weekly prayer services attended by Muslims in the general prison population. Prison officials testified that allowing inmates under a sentence of death to mingle with the general prison population would create a considerable security risk because of their fatalistic attitude toward escape attempts and destructive behavior.

In considering the challenge, we approved the district court's application of a two-part standard articulated by the Third Circuit in *St. Claire v. Cuyler*, 634 F.2d 109 (3d Cir.1980), for resolving the conflict between a prisoner's first amendment rights and the state's interest in institutional security. We noted in our opinion that the Third Circuit standard was derived from a sound reading of the Supreme Court's decisions in *Pell*, *Jones*, and *Bell*.

In *St. Claire*, the Third Circuit stated that

[prison officials need] only to produce evidence that to permit the exercise of first amendment rights would create a potential danger to institutional security. This evidence may consist of expert testimony from the responsible officials, provided they testify to opinions that are "held 'sincerely' and [are] arguably correct." [*Jones*, 433 U.S. at 127 (97 S.Ct. at 2539).] * * * Once the state has met its burden of going forward with the evidence, the courts must defer to the expert judgment of the prison officials unless the prisoner proves by "substantial evidence ... that the officials have exaggerated their response" to security considerations, *Pell*, 417 U.S. at 827 [94 S.Ct. at 2806], or that their beliefs are unreasonable, *Jones*, 433 U.S. at 128 [97 S.Ct. at 2539].

*St. Claire*, 634 F.2d at 114–15. We concluded in *Otey* that the prisoner "did not adduce any evidence to demonstrate that the regulation prohibiting [inmates sentenced to the penalty of death] from attending corporate worship services was an exaggerated response to concerns of institutional security." 680 F.2d at 1234.

From an analysis of the cases discussed above, it is self-evident that the district court must necessarily balance the need for the particular regulation against the invasion of religious freedom that the restriction entails. *Pell*, 417 U.S. at 822–23, 94 S.Ct. at 2804; *Brown v. Johnson*, 743 F.2d 408, 411 (6th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 1190, 84 L.Ed.2d 336 (1985). On the one hand, the prisoner has an interest in the exercise of his first amendment right. In that regard, the prisoner must show that his belief is religious in nature and sincerely held. Additionally, the prisoner must show that the regulation

in question does, in fact, infringe upon that belief.

 On the other hand, the state has an interest in establishing prison regulations in furtherance of legitimate penological objectives. Because of the deference that must be accorded to the prison officials' expert judgment in matters of prison administration, the responsible officials need only to show that the exercise of the challenged religious belief could create a potential threat to a legitimate penological objective. In that instance, the prisoner's right must yield to the prison regulation. However, if the record contains substantial evidence that the prison officials' belief as to the need for the regulation is unreasonable, or that the officials have exaggerated their response to an otherwise legitimate penological objective, the rule of deference loses its force and the district court must determine on the record whether the prison officials have indeed shown that the restrictive regulation is justified. *See, e.g., Gregory v. Auger*, 768 F.2d 287, 290–91 (8th Cir.1985).

In this case, Blackwell and Wyrick do not challenge the sincerity of Hill's religious belief in his desire to grow a beard. Furthermore, the regulation clearly precludes Hill from exercising that belief. Hence, the district court acted properly in applying the two-part standard articulated in *St. Claire* and referred to by this circuit in *Otey*.

 In evaluating the district court's determination that Hill's first amendment rights were violated under the standard espoused in *St. Claire*, we must consider the appropriate scope of our review. Following *St. Claire*, the Third Circuit in *Cole v. Flick*, 758 F.2d 124, 130 (3d Cir.1985), concluded that "[w]hether a regulation represents an exaggerated response to a legitimate security concern, and whether a security concern is itself unreasonable, are mixed questions of fact and law." We agree. While the district court must necessarily find the facts that either support or undermine the constitutionality of a particular regulation, the ultimate conclusion as to constitutionality is a question of law. The factual component of the determinations is subject to the clearly erroneous standard of review, while our review of the ultimate legal conclusion is plenary.

## Application of the Standard

In light of the record evidence and relevant case law, our review leads us to conclude that the district court's ruling was in error.

We believe the district court "got off on the wrong foot in this case by not giving appropriate deference to the decisions of prison [officials]." *Jones*, 433 U.S. at 125, 97 S.Ct. at 2537. Warden Wyrick testified that the beard regulation is necessary to the maintenance of institutional security at the Missouri State Penitentiary. He noted that the Missouri State Penitentiary is a maximum security institution that houses inmates sentenced to death or extremely long terms, or inmates transferred from other penal institutions due to serious rules violations or attempts at escape. Thus the inmates housed at the Missouri State Penitentiary are, on a whole, high security risks for escape. Hill, for example, is serving two consecutive life sentences and two consecutive sentences of 100 years on four counts of first degree murder, and has been involved in numerous altercations while in prison.

In Wyrick's opinion, the prison grooming regulation preventing the growing of beards assists in the instant, accurate identification of inmates that is so necessary for the maintenance of institutional security. Prison officials and guards must necessarily have the ability rapidly to identify inmates involved in prison assaults and escape attempts. According to Wyrick, the high turnover of guards at the Missouri State Penitentiary affects their ability to make instant, accurate identifications.

Wyrick testified that prisoners involved in criminal activity—assaults or escapes—frequently alter their appearance to avoid detection. According to Wyrick, the growing or shaving of a beard is particularly

effective in altering one's appearance. A beard normally covers a number of identifying facial features, and further, a change in the shape or length of the beard can itself significantly alter an individual's appearance. As noted by the magistrate in his report and recommendation to the district court, the radical change in appearance effectuated by a prisoner's shaving of his beard "[may] also permit an inmate to mingle with visitors without detection, thus opening an avenue of escape not otherwise available to him." Thus the beard regulation assists in the accomplishment of institutional security by minimizing an inmate's ability to alter his appearance rapidly and significantly.

▮ Without even alluding to Warden Wyrick's testimony that the regulation assists in the rapid identification of inmates that is so necessary for the prevention and detection of inmates' assaults and escapes, the district court stated that there was "no credible evidence on the record" to support a need for the regulation on the basis of institutional security. The district court must have believed that the warden's concern for institutional security was "founded only on fear and apprehension" and was "insufficient to overcome rights asserted under the First Amendment." *Teterud*, 522 F.2d at 361–62. We cannot agree. We conclude that Wyrick has presented evidence as to the reasonableness of the regulation and that Wyrick's expert opinion as to the regulation's effect on institutional security is sincerely held and arguably correct. *Jones*, 433 U.S. at 127, 97 S.Ct. at 2538.

▮ It was thus incumbent upon the prisoner to show by substantial evidence that Wyrick's beliefs are unreasonable, *id.* at 127–28, 97 S.Ct. at 2538–39, or that the officials have exaggerated their response to legitimate institutional considerations, *Bell*, 441 U.S. at 561–62, 99 S.Ct. at 1885–86; *Otey*, 680 F.2d at 1234. Notably, the burden of presenting "substantial evidence" is quite heavy. *Bell*, 441 U.S. at 548, 561–62, 99 S.Ct. at 1885–86; *Wilson v. Schillinger*, 761 F.2d 921, 927 (3d Cir.1985)

(quoting *Cole v. Flick*, 758 F.2d 124, 128–29 n. 7 (3d Cir.1985)). In the absence of such a showing, the district court was obligated to defer to the expert judgment of the prison officials. *Bell*, 441 U.S. at 548, 99 S.Ct. at 1879; *Jones*, 433 U.S. at 128, 97 S.Ct. at 2539; *Pell*, 417 U.S. at 827, 94 S.Ct. at 2806. After a careful review, we conclude that there is not substantial evidence of record to support the district court's determination that Wyrick's beliefs as to the need for the prison grooming regulation are unreasonable or that the prison officials have exaggerated their response to legitimate institutional considerations.

The district court relied on a number of facts of record and of which it took judicial notice to support its conclusion of unreasonableness or exaggeration. Initially, the court noted that inmates in all federal institutions are permitted to wear beards, *see* 28 C.F.R. § 551.2, as are inmates at a number of state institutions, *see Moskowitz v. Wilkinson*, 432 F.Supp. 947, 950 n. 8 (D.Conn.1977). According to a survey conducted by the Department of Corrections at the court's request in *Moskowitz*, of the 45 states replying to the survey, 23 allowed beards. "Of these, 20 allowed beards in all institutions; two restricted beards to certain types of institutions; and one allowed beards after an initial clean-shaven picture." *Id.*

We believe it significant that although 21 states allow inmates in all institutions within their state to grow beards, prison officials in 22 other states have concluded, in their informed discretion, that the growing of beards by inmates in their institutions is unacceptable. There is no evidence in the record to indicate that the security problems at the various federal and state institutions allowing beards are at all comparable to the security problems at the Missouri State Penitentiary. Wyrick testified that he had a significantly high turnover in guards at the Missouri State Penitentiary that affected the overall ability of guards to identify inmates instantly and accurately. Although the policy of other institutions is relevant in determining the need

for a particular regulation, it is clearly not dispositive. *Martinez*, 416 U.S. at 414 n. 14, 94 S.Ct. at 1812 n. 14; *Teterud*, 522 F.2d at 361 n. 9.

In this case it is enough to say that although the federal institutions and approximately one-half of the states responding to the survey do not enforce a beard regulation, approximately one-half of the states have determined that enforcing a beard regulation is important to the proper functioning of their penal institutions. This evidence, in the context of the entire record, does little to assist the prisoner in meeting his obligation to produce substantial evidence of an exaggerated response. It appears that the district court in this case simply preferred the practice of the federal institutions and one-half of the responding state institutions that do not regulate the growing of beards. On the basis of this preference, the district court rejected the judgment of Missouri State Penitentiary prison officials "about the extent of the security interests affected and the means required to further those interests. But [the Supreme Court's] decisions have time and time again emphasized that this sort of unguided substitution of judicial judgment for that of the expert prison administrators on matters such as this is inappropriate." *Bell*, 441 U.S. at 554, 99 S.Ct. at 1882.

The district court also concluded that any difference in the need for the regulation at the Missouri State Penitentiary as compared to federal institutions cannot be explained on the basis of differences in guard/inmate ratios in the two systems. The evidence of record indicates that the guard/inmate ratios at the Missouri State Penitentiary and at Security Level 5 federal institutions are nearly identical.

Initially, we note that we can find no basis in the record for comparing the security problems at Level 5 federal institutions with those at the Missouri State Penitentiary. Notably, state institutions often house a different kind of prisoner than those housed even in a high security federal facility. Further, a bare comparison of the guard/inmate ratios at the Missouri State Penitentiary and Security Level 5 federal institutions ignores the testimony of Warden Wyrick that the ability of Missouri State Penitentiary guards to identify inmates rapidly is affected by a high turnover in guards at the Missouri State Penitentiary and the fact that during certain watches only a small number of the guards are in close contact with the prisoners. Again, we indicate that the record evidence does not support a conclusion that the security problems at the federal institutions are at all comparable, and, assuming that they are, policies at other institutions, although relevant, are not dispositive, *see Martinez*, 416 U.S. at 414 n. 14, 94 S.Ct. at 1812 n. 14.

The district court viewed as significant the experience of the federal prison system during a one-year experimental period in which it permitted inmates with religious claims to grow beards. The district court, relying on *Moskowitz*, 432 F.Supp. at 951, noted that during this period of time, only about 1% of the federal prisoners asserted a religious interest in wearing a beard. The court further noted that Warden Wyrick testified that if only a small number of inmates grow beards, a beard would serve as an identifying factor rather than operating to thwart instant, accurate identifications. The court also pointed to Wyrick's testimony that if the beard regulation were abolished, he believes that 75% of the inmates would grow beards, as evidence that the prison officials have exaggerated their response to legitimate security concerns.

We do not believe that Warden Wyrick's estimate of 75% or the federal prison experience of 1% in any way evidences that the Missouri State Penitentiary prison officials' beliefs are unreasonable or that they have exaggerated their response to legitimate security concerns. First, in the context of the entire record, it appears that Wyrick's 75% estimate assumed a situation in which all inmates, not just those with sincerely held religious beliefs, would be allowed to grow beards. Second, while Warden Wyrick testified that if only a small number of inmates had beards that the beard would

serve as an identifying factor, he further testified, with respect to an example, that if 12 inmates had beards, the beards could create problems for instant, accurate identification. Wyrick testified that if 50–60 inmates were permitted to grow beards, the Missouri State Penitentiary clearly would suffer serious security problems due to an inability instantly to identify prison inmates.

The chaplain who supervises and coordinates the religious services of Muslims in the various penal institutions throughout Missouri testified that he believed that, if permitted, all 90 of the practicing Muslims out of the 2150 inmates at the Missouri State Penitentiary would elect to grow beards. Further, Warden Wyrick testified that he had received a few requests from non-Muslim inmates for permission to grow beards on religious grounds. Thus, the 1% federal prison experience does not appear to be an accurate estimate of the percent of inmates at the Missouri State Penitentiary that would request an exemption from the beard regulation on religious grounds. Finally, assuming the 1% figure is accurate with respect to the Missouri State Penitentiary, the warden has testified that a figure less than 1% (12 inmates as compared to a 1% figure of 21 inmates) would accentuate security problems at the Missouri State Penitentiary.

The district court also considered the warden's testimony that an elimination of the beard regulation would necessitate rephotographing inmates to reflect the changes in their appearance. Warden Wyrick testified that the prison would be having to take "10,000 photographs a week," and that such a system would be cost prohibitive and administratively burdensome. The district court viewed the warden's estimate of "10,000 photographs a week" as support for the conclusion that the prison officials' security concerns are exaggerated, and the court also concluded that the prison officials' criticism of the rephotographing system was based primarily on concerns for administrative time and expense, not on concerns for security.

The warden's characterization of "10,000 photographs a week" is clearly an overstatement of the number of pictures that would have to be taken. However, this unnecessarily expansive statement neither adds to nor detracts from the warden's testimony respecting the need for guards to have the ability visually to identify inmates in order to prevent and detect inmate assaults and escape attempts. While the warden did testify that the system would be cost prohibitive and administratively burdensome, he also testified that prisoner photographs are taken in an unsecure area of the prison and that a program of rephotographing inmates would operate further to threaten institutional security. We simply do not view the warden's testimony concerning rephotography as supportive of the district court's conclusion that the prison officials exaggerated their response to the legitimate security consideration articulated by the warden.

Lastly, the district court pointed to the beard regulation itself as evidence that the prison officials' response to security concerns is exaggerated. First, the district court noted that although the regulation prohibits inmates from growing beards, it permits them to grow moustaches no wider than the mouth and sideburns to the bottom of the ears. Warden Wyrick testified that inmates are permitted to grow "Afro" hairstyles and to wear their hair to the base of the collar. Thus, the district court noted, an inmate is able to alter his appearance simply by growing a moustache and sideburns and changing the length of his hair. The need for the beard regulation is called into question, according to the district court, by the absence of more restrictive requirements with respect to an inmate's other grooming habits. Second, the district court concluded that the fact that the beard regulation provides that it will not be enforced in minimum security institutions in Missouri calls into question the need for the regulation.

We do not believe that either the more relaxed restrictions respecting an inmate's other grooming habits or the fact that the

beard regulation is not enforced in minimum security facilities in Missouri amounts to evidence that the prison officials' beliefs are unreasonable or that they have exaggerated their response to legitimate security considerations. To the contrary, if anything, the regulation evidences a sensitivity on the part of the prison officials to the grooming preferences of inmates. Prisoners are permitted to groom as they desire up to the point where their grooming habits interfere with legitimate security concerns of the institution.

Prison officials have drawn the line at the growing of beards by inmates except in certain minimum security facilities. Warden Wyrick testified that compared to the other grooming habits, a beard is a different degree of disguise. A beard operates to cover a number of identifying facial features, and a change in the shape or length of the beard itself, according to Wyrick, can significantly alter an individual's appearance. Further, the fact that the regulation is not enforced in certain minimum security facilities in Missouri is irrelevant. Inmates in these minimum security facilities are one step from freedom and often are participating in community work release programs. Thus, unlike the situation at the Missouri State Penitentiary, escape from a minimum security facility does not hinge on avoiding detection. Rather, an inmate can escape from the facility simply by walking away. The security risks and thus the need for instant, accurate identification of inmates are not the same at the minimum security facilities.

Although we do not disagree with the dissent's view that several of Wyrick's remarks "appear to be flippant," *infra* at 348, these remarks do not detract from the warden's basic premise that the grooming regulation preventing the growing of beards assists prison guards to make instant, accurate identifications of inmates. This consideration standing alone supports the reasonableness of the regulation in promoting institutional security. Hence, even if Wyrick was a nonchalant witness, we are not in a position to invalidate an otherwise legitimate prison regulation.

Because the security interest embodied in Wyrick's expert opinion is legitimate and on its face provides adequate justification for the limited restriction of Hill's first amendment rights, it was incumbent upon Hill to present substantial evidence that the prison officials' beliefs are unreasonable, *Jones*, 433 U.S. at 128, 97 S.Ct. at 2539, or that they have exaggerated their response to security considerations, *Pell*, 417 U.S. at 827, 94 S.Ct. at 2806. This Hill has failed to do, and thus we necessarily defer to the informed discretion of the prison officials. *Hewitt v. Helms*, 459 U.S. 460, 474, 103 S.Ct. 864, 872, 74 L.Ed.2d 675 (1983); *Bell*, 441 U.S. at 548, 99 S.Ct. at 1879; *Jones*, 433 U.S. at 128, 97 S.Ct. at 2539; *Pell*, 417 U.S. at 827, 94 S.Ct. at 2806.

## Conclusion

"[A] prison inmate retains those First Amendment Rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell*, 417 U.S. at 822, 94 S.Ct. at 2804. Other than being denied an exemption from the beard regulation, Hill has been accommodated in the practice of his religious beliefs. He is permitted to observe Ramadan, a month of fasting and self-denial; he has served as an imam, a religious leader selected on the basis of his knowledge of the faith; he is permitted to participate regularly in prayer services; he has a collection of books about the Muslim religion in his cell; and he regularly counsels with the Muslim chaplain. He is also permitted to grow sideburns and a moustache in accordance with the Muslim practice of growing facial hair. Thus, the grooming regulation in question is "an intelligent effort to use the least restrictive means necessary for security. Such attempts to accommodate First Amendment rights are to be encouraged, not penalized." *Abdullah v. Kinnison*, 769 F.2d 345, 350 (6th Cir.1985) (per curiam).

"The fact of confinement and the needs of the penal institutions impose limitations on constitutional rights, including those de-

rived from the First Amendment, which are implicit in incarceration." *Jones,* 433 U.S. at 125, 97 S.Ct. at 2537. The prison officials have concluded that the prison grooming regulation prohibiting inmates from growing beards is necessary to the maintenance of institutional security at the Missouri State Penitentiary. It is enough to say that their response to this legitimate security consideration has not been shown to be exaggerated. We reverse.

ARNOLD, Circuit Judge, dissenting.

The Court's opinion has performed a significant service in harmonizing and clarifying our cases dealing with the assertion of First Amendment rights by prison inmates. I have no quarrel with the legal framework set out in the opinion, or with its discussion of the proper scope of review in appeals of this kind. My disagreement comes, instead, with the application of this analytical framework to the particular facts of the case before us.

The facts are fully stated in the opinion of the District Court, with which I am in substantial agreement. I would add only a few observations. The Court criticizes the District Court for stating that the Warden's concerns for institutional security were "founded only on fear and apprehension." *Ante* at 344. The Court also disagrees with the District Court's assessment that there was "no credible evidence on the record" to support a need for the regulation in question. I believe that this Court owes more deference to the assessment of the facts and circumstances, including the demeanor of witnesses, by the trier of fact. Having read the transcript of the trial, I believe there were ample grounds for the District Court's skepticism.

The only witness testifying for the defendants below was the defendant Donald Wyrick, Warden of the Missouri State Penitentiary. Several portions of Warden Wyrick's testimony appear to be flippant, or, at least, insufficiently aware of the seriousness of claims of First Amendment rights. He began testifying, for example, by stating that if he had thought of it he would

have come to court with a false beard, just to see if the judge could have recognized him. Tr. 51. He also stated that he couldn't even recognize his own brother "if he has got a full beard and long hair," Tr. 87, and that, if the plaintiff's claim should be upheld, "Pretty soon, everyone has got beards. I would probably grow one, too, you know." Tr. 82. In addition, the Warden's reference to one of the predecessors of the present Muslim Chaplain (one of plaintiff's witnesses) as "the other little fellow," Tr. 86, could have led the trier of fact to take less than seriously the Warden's protestations that he had properly weighed the religious interests involved against the need for institutional security. The Warden seems to have doubted, in fact, the sincerity of the plaintiff's religious commitment, a fact that the State does not now dispute and that this Court's opinion takes as a given. Tr. 82. The Warden also stated that he did not believe that only one per cent. of the inmates in the federal prison system had chosen to wear beards after that practice had been made permissible. Tr. 77. Again, the state does not contest this fact, and this Court's opinion assumes it to be true. The Warden's attitude is based upon a clear misapprehension of the facts, the kind of misapprehension that would completely justify labeling his response as "exaggerated."

The Court mentions the District Court's reference to the Warden's belief that 75 per cent. of the inmates would grow beards if permitted to do so. This Court explains, *ante* at 345, that the Warden's estimate assumed a situation in which all inmates, not just those with sincerely held religious beliefs, would be allowed to grow beards. I disagree with this reading of the record. The following question and answer appear on page 57 of the transcript:

Q. Do you have any idea of how many of these other inmates would want to grow beards and claim some religion?

A. I think probably 75 percent of the inmates in there would at least initially until they got tired of it.

The purport of this testimony is quite clear. The Warden was saying that 75 per cent. of the inmates would claim some kind of religious scruple in order to get permission to wear a beard. The adjective "exaggerated" seems made for this kind of statement. There is absolutely no evidence to support such a claim, either in the present record or in the experience of other prison systems where beards have been permitted. It seems to me that the District Court was well within its rights in regarding this kind of reaction as "exaggerated." The same thing is true of the Warden's claim that the prison system would have to take 10,000 photographs a week if the rule were to be as the plaintiff requested. This is obviously a gross overstatement. There were, at the time of trial, about 2,150 inmates in the Missouri State Penitentiary. Each inmate would have to have his picture taken five times a week if the Warden's characterization were correct. This kind of "unnecessarily expansive statement," *ante* at 346, seems to me precisely the kind of thing that one would look for in determining whether a response by prison officials to legitimate security considerations is "exaggerated."

Finally, I am concerned with the heavy emphasis placed by the Warden and by this Court on the relevance of cost considerations. I can see the argument that allowing prisoners to grow beards might help some prisoners, either those committing assaults within the prison or those planning to escape, get away. It seems just as clear, though, that these problems could be met by improved training of staff, increased numbers of staff, or a combination. The federal government, of course, has a great deal more money than the State of Missouri, but the same is presumably not true of at least some of the 20-odd states that permit inmates to grow beards. Therefore, the cost of accommodating the prison system to a religious exemption from the no-beard rule seems to be less than prohibitive. In addition, constitutional rights should not be granted or denied primarily on the basis of monetary costs to the government. I am not prepared to say

that the cost of a certain accommodation between security and religious belief is an irrelevant consideration, but I do believe that it should not be given dispositive weight. Otherwise, First Amendment rights become ephemeral. I am reminded of this Court's pioneering opinion in *Jackson v. Bishop*, 404 F.2d 571 (8th Cir.1968), in which we held the use of the strap as a disciplinary measure in the Arkansas State Penitentiary violative of the Eighth and Fourteenth Amendments. The State had urged, in support of its practice, that it could not afford to provide other means of prisoner regulation. This Court, speaking through Judge (now Mr. Justice) Blackmun made the following reply:

> Humane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar considerations....

404 F.2d at 580.

For these reasons, I respectfully dissent. I would affirm the judgment of the District Court.