## INDIAN INMATES OF the NEBRASKA PENITENTIARY, Plaintiffs,

### v.

## Gary GRAMMER, individually and in his capacity as Warden, Defendant.

### No. CV72–L–156.

United States District Court,
D. Nebraska.

Dec. 16, 1986.

Charles Humble, Lincoln, Neb., for plaintiffs.

---

Steve Moeller, Asst. Atty. Gen., Lincoln, Neb., for defendant.

## MEMORANDUM OF DECISION

URBOM, District Judge.

The plaintiffs, Native American inmates in the Nebraska penal system, requested a trial on their motion to show cause why defendant Gary Grammer should not be punished for contempt. They allege that Grammer, Warden of the Nebraska State Penitentiary, has failed to comply with the portion of the 1974 order of this court concerning the exercise of Native American religious beliefs by inmates, and thus is in contempt of this court under 18 U.S.C.A. § 401(3) (1966).

On October 31, 1974, the original parties consented to the order, judgment and decree that is involved in the present litigation. Paragraph two of the consent decree provides that:

> In order to meet the religious and spiritual needs of the plaintiff class, defendants shall allow inmates access to Indian medicine men and spiritual leaders and provide facilities for spiritual and religious services, including but not limited to the Native American Church. Further, defendants will set aside a percent of its budget (that reflects the percent of the Indian inmates in the Penal Complex) which at any given time is allocated for other clergy salaries and expenses attendant to providing services to members of other religious faiths, to payment of fees and expenses attendant to providing Indian religious services or ceremonies.

Filing 48 at 2. A supplemental consent decree of May 24, 1976, ordered that a sweat lodge, agreed to be "a 'facility' for the worship of Indian religion," be made available at the Nebraska Penal and Correctional Complex. Filing 51.

The inmates assert that, because the sacrament peyote is a fundamental part of Native American Church services, the defendant has violated the consent decree by prohibiting all use of peyote in the Nebraska penal system. The defendant responds that he has complied in good faith with the terms of the agreement, and that introduction of the hallucinogen peyote into the prison system would threaten important penological objectives.

After a trial on this matter, I conclude that neither the consent decree nor the first amendment of the United States Constitution requires that the inmates be given access to peyote for Native American Church services in the prison setting.

## I. FACTS

Members of the Native American Church are Native Americans affiliated with many different North American tribes. They both observe their particular tribal customs and practice the religious teachings of the Native American Church. Members who testified at trial listed three requirements for membership in the church: (1) a minimum of 25% Indian blood; (2) enrollment in a particular Indian tribe; and, (3) a commitment to worshipping God. Enrollment records are kept by each tribal office and serve to verify both tribal membership and Indian identity. Most Native Americans are enrolled at birth or as young children by their parents.

The Native American Church members believe in God as the Supreme Being and in Jesus Christ. Members seek to live righteously and shun the use of alcohol. They believe that peyote, derived from a species of cactus grown in southern Texas, is a sacrament that God created for the Indian people. The sacrament is central to the Native American Church worship service and is used for spiritual purposes as an aid to meditation that worshipers say brings them closer to God and facilitates self-awareness, humility, peacefulness and righteous living. Each tribe has a peyote custodian who procures peyote from dealers in southern Texas for use in worship services. The dried peyote "buttons" are ground and then consumed in powder or tea form.

The worship service typically begins at sunset Saturday evening, ends at sunrise Sunday morning, and usually is held in the

home of the sponsor, who bears the expense of providing the peyote and the meals. During the summer months services might be held in a tepee. A "roadman," assisted by the "fireman," "cedarman," and "drummer," conducts and supervises the service. Worshipers, seated in a circle, partake of the peyote two or three times during a service, and meditate for several hours after each use of the sacrament. Both the testimony about witnesses' personal worship experiences and the testimony concerning the literature produced by those who have studied Native American Church services agreed that the mood during the services is calm and meditative and that participants do not exhibit inappropriate behaviors.

Dr. Miriam Haworth, psychologist for the Department of Correctional Services, testified that the effects of peyote on a user resemble those experienced by users of hallucinogens such as lysergic acid diethylamide (LSD) or mescaline. The user may experience hallucinations, introspection, altered mood, and altered thought process. The mood of the user and the surrounding environment will influence the user's reaction to taking peyote, and it is not possible to predict the length and types of effects that a user will experience. Native American Church witnesses testified that the effects of peyote dissipate by the end of the service and that use of peyote can have a highly positive rehabilitative effect in the lives of church members, particularly those previously affected by substance abuse.

The Nebraska correctional system, since the 1974 consent decree, has been notable in its accommodation of Native American culture and religion. Funds have been appropriated for Native American religious purposes, as required by the consent decree. Since the supplemental decree in 1976, inmates have had access to a sweat lodge at the penitentiary. Although not a part of the Native American Church service, the sweat lodge nevertheless is used by some church members as preparation for worship and for purification. Inmates have participated in the customs of various tribes, such as the sun dance and the pipe ceremony, and have had occasional access to roadmen for devotional services. They have not been permitted a full Native American Church service because of the ban on use of peyote.

The plaintiffs are willing to work with prison officials to plan Native American Church services that limit the potential problems that could come from introducing peyote into the prison setting. They would, for example, agree to meet in a room rather than a tepee, conduct their service during a Saturday afternoon, use the noon and evening meals as part of the ceremony, and use peyote only in tea form and limit the amount used. The estimated cost for a service for only a few inmates is $150 to $200, so services probably could be held only once or twice each year.

Peyote is classified as contraband under prison regulations. *See* Operational Memorandum 205.1.111; Administrative Regulations 204.1, 205.1 (Exhibits 104, 105, 106). It, like alcohol, is not permitted in the prisons, even for religious purposes. Gary Grammer, Harold Clarke, Deputy Warden, and Frank Gunter, Director of the Department of Correctional Services, all testified that they believed that peyote was not contemplated by those agreeing to the consent decree. They also testified that use of peyote in the prison setting would be a threat to prison security.

The prison officials testified that it would be difficult to control both the transportation and administering of peyote, even if in liquid form. They anticipate problems of inmate discipline, pressuring of inmates and Native American Church leaders, and safety. The effects of a mood-altering drug on the safety of worshipers, other inmates, and prison employees present the potential for serious problems, in the opinion of prison officials.

## II. ANALYSIS

"Peyotism discloses a long history. A reference to the religious use of peyote in Mexico appears in Spanish historical

sources as early as 1560." *People v. Woody*, 61 Cal.2d 716, 394 P.2d 813, 817, 40 Cal.Rptr. 69, 73 (1964). "[B]elievers who worship at the Native American church cannot freely exercise their religious beliefs absent the use of peyote." *State v. Whittingham*, 19 Ariz.App. 27, 504 P.2d 950, 952 (1973).

Peyote, however, is a controlled substance, classified as a hallucinogen. *See* 21 U.S.C.A. § 812(c) Schedule I(c)(12) (1981); Neb.Rev.Stat. 28–405 ScheduleI(c)(12) (1985). "In the Drug Abuse Control Amendments of 1965, Congress for the first time controlled the possession, consumption and sale of peyote.... The 1965 Amendments were later superseded by the [Controlled Substances] Act, which carried forward the controls on peyote." *Native American Church of New York v. United States*, 468 F.Supp. 1247, 1249 (S.D.N.Y. 1979), *aff'd*, 633 F.2d 205 (2d Cir.1980).

The Drug Enforcement Administration determined, however, "that Congress did not intend in the 1965 Amendments or the 1970 Act to prohibit the use of peyote in religious ceremonies of the Native American Church," *id.*, and created a regulatory exception.

> The listing of peyote as a controlled substance in Schedule I does not apply to the nondrug use of peyote in bona fide religious ceremonies of the Native American Church, and members of the Native American Church so using peyote are exempt from registration.

21 C.F.R. § 1307.31 (1986). This exception subsequently was "supported by the legislative history and congressional findings underlying the American Indian Religious Freedom Act," 42 U.S.C.A. § 1996 (1981), which became effective August, 1978. *United States v. Rush*, 738 F.2d 497, 513 (1st Cir.1984); *see also* 1978 *U.S.Code Cong. & Ad.News* 1262, 1263–65.

The present case deals not with the right of Native Americans to use peyote during Native American Church services, which is an established one, but with whether inmates who are members of the Native American Church are entitled, either under the consent decree or the first amendment, to use peyote during worship services held in the prison setting. In considering these questions, I am mindful of the central role of the sacrament peyote in Native American Church services, and accept as sincere the professed beliefs of the inmate church members.

## A. THE CONSENT DECREE

■ To establish contempt, the plaintiffs must show by clear and convincing evidence that the defendant violated the 1974 consent decree. *See Washington-Baltimore Newspaper Guild, Local 35, of the Newspaper Guild, AFL–CIO–CLC v. The Washington Post Co.*, 626 F.2d 1029, 1031 (D.C.Cir.1980); *Kansas City Power & Light Co. v. National Labor Relations Board*, 137 F.2d 77, 79 (8th Cir.1943).

The plaintiffs urge a broad interpretation of the consent decree that emphasizes the language "to meet the religious and spiritual needs of the plaintiff class." They argue that prison officials knew or should have known in 1974 that peyote is a fundamental part of Native American Church services, and, that "to meet the religious and spiritual needs" of those who would attend "religious services, including ... the Native American Church," they should permit use of peyote during worship services.

The defendant argues for a reading that interprets the decree to require access to religious leaders, provision of worship space, and appropriation of funds. The defendant asserts that the idea of introducing a controlled substance into the prison setting is so unusual that, were it to have been contemplated in 1974, it would be something one would expect to find stated explicitly in the consent decree. Finally, the defendant contends that a ten-year lag between the consent decree and the inmates' first assertion that peyote use was intended in 1974 suggests that the plaintiffs' view is a recent invention.

I agree with the defendant's interpretation of the consent decree. There was no testimony at trial that the parties to the 1974 consent decree considered use of pey-

ote to be part of the decree, and the prison officials who testified said that they believed peyote not to be a part of the requirements of the decree. The language of paragraph 2 does not suggest otherwise. Prison officials are to permit contact with church leaders, provide a place for inmates to worship, and apportion part of the religion budget for Native American religious activities. This they have done.

I conclude, therefore, that the 1974 consent decree does not require prison officials to permit use of peyote within correctional facilities during Native American Church services. Because there is no requirement that peyote use be permitted, the defendant has not violated the 1974 consent decree and is not in contempt of this court.

## B. FIRST AMENDMENT FREE EXERCISE RIGHTS

Although the consent decree does not require use of peyote in correctional facilities, the question remains whether the first amendment does. "[C]onvicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979). They "enjoy freedom of speech and religion under the First and Fourteenth Amendments...." *Id.*

■ Nevertheless, "[t]he fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration." *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 125, 97 S.Ct. 2532, 2537, 53 L.Ed.2d 629 (1977). Moreover, "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell,* 441 U.S. at 547, 99 S.Ct. at 1878.

The goals of correctional institutions include deterring crime, rehabilitating criminals, protecting the public, and maintaining institutional security. *Pell v. Procunier,* 417 U.S. 817, 822–23, 94 S.Ct. 2800, 2804,

41 L.Ed.2d 495 (1974). "[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of [inmates'] retained constitutional rights," including those derived from the first amendment. *Bell,* 441 U.S. at 546–47, 99 S.Ct. at 1877–78. In according proper deference to prison officials' rationale for limiting the rights of inmates, district courts are reminded that "federal courts do not sit to supervise state prisons." *Meachum v. Fano,* 427 U.S. 215, 228–29, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451 (1976).

Although "the Supreme Court has yet to address specifically the scope of review over prison regulations limiting religious activity," it "has shown no inclination to draw arbitrary distinctions among constitutional guarantees for the purposes of analyzing inmates' rights...." *Shabazz v. O'Lone,* 782 F.2d 416, 431 (3d Cir.1986) (en banc) (Hunter, J., dissenting), *cert. granted,* — U.S. —, 107 S.Ct. 268, 93 L.Ed.2d 245 (1986). Although we do not yet have the benefit of the Supreme Court's opinion in *Shabazz,* the Supreme Court's prior cases and the Eighth Circuit's application of that precedent in inmate free exercise cases clearly suggest that the same level of deference to prison officials' expertise is required in the present case.

The defendant, therefore, "need only ... show that the exercise of the challenged religious belief could create a potential threat to a legitimate penological objective. In that instance, the prisoner's right must yield to the prison regulation." *Hill v. Blackwell,* 774 F.2d 338, 343 (8th Cir.1985). Deference is reduced only "if the record contains substantial evidence that the prison officials' belief as to the need for the regulation is unreasonable, or that the officials have exaggerated their response to an otherwise legitimate penological objective...." *Id.* In such instances, "the district court must determine on the record whether the prison officials have indeed shown that the restrictive regulation is justified." *Id.*

■ The prison officials in the present case have presented credible testimony of

their belief that introduction of the contraband peyote into the prison setting would be a serious threat to important penological objectives, such as maintaining security. There is no evidence that their response is "unreasonable" or "exaggerated." Thus, I must accord deference to their opinions. There is substantial evidence that prison officials have taken steps to accommodate the inmates' religious and cultural practices. *See Hill*, 774 F.2d at 347 ("Other than being denied an exemption from the beard regulation, Hill has been accommodated in the practice of his religious beliefs."); *Dettmer v. Landon*, 799 F.2d 929, 934 (4th Cir.1986) ("The restrictions imposed on Dettmer must be viewed in context of the accommodations officials have made to allow him to observe his religious beliefs.").

Not permitting Native American inmates a full Native American Church worship service is a serious interference with their free exercise rights. Nevertheless, the potential threat that peyote use in the prison setting poses to security, safety, and discipline weighs heavy in the balance. Many accommodations have been made to facilitate the inmates' free exercise rights, but, in the prison setting, these rights must yield to the extent that the use of peyote is forbidden.