Azim ABDULLAH, et al., Plaintiffs-Appellants,

v.

Lt. KINNISON, et al., Defendants-Appellees.

No. 83–3326.

United States Court of Appeals, Sixth Circuit.

Argued and Submitted Aug. 23, 1984.

Decided July 30, 1985.

A.P. Anninos, Simon, Anninos & Namanworth Co., Cincinnati, Ohio, for plaintiffs-appellants.

Frank F. Pertz, Asst. Atty. Gen., Raymond J. Studer, argued, Columbus, Ohio, for defendants-appellees.

Before ENGEL and MARTIN, Circuit Judges, and WISEMAN, District Judge.*

PER CURIAM.

Appellants Azim Abdullah (Azim) and Abdullah Akbar (Akbar) appeal the order of the United States District Court for the Southern District of Ohio granting summary judgment for the appellees, who are officers of the Southern Ohio Correctional Facility. The primary issue remaining in this section 1983 case concerns the constitutionality of a prison directive restricting prisoners' use of white Hanafi Muslim prayer robes to the prison chapel.

## I.

Azim Abdullah (a/k/a R. Hembrick) and Abdullah Akbar (a/k/a Ronald Scheel) were prisoners incarcerated at the South-

---

* Honorable Thomas A. Wiseman, Jr., United States District Court Judge for the Middle District of Tennessee, sitting by designation.

ern Ohio Correctional Facility (SOCF), a maximum security institution at Lucasville, Ohio, when they filed their section 1983 complaint in 1978. Both Azim and Akbar are practicing Hanafi Muslims (sometimes also referred to as Sunni Muslims). In addition, Akbar claims that he is an Imam, which is a religious and secular leader in the Hanafi Muslim faith.

Until November, 1977, appellants (and the approximately twelve to twenty-five other practicing Hanafi Muslims at SOCF) were permitted to keep full-length, hooded, white prayer robes in their cells. In his deposition Akbar testified that under the Sunna, or Islamic law, Hanafi Muslims should wear such prayer robes at all times, if possible, and must wear them during the prayers that they say five times each day. Akbar stated that these prayer robes must be white, although an Imam may wear either a black or a white robe.

On November 18, 1977, Ronald Marshall, the SOCF Superintendent, issued a directive to all SOCF inmates restricting use of the white prayer robes to the institutional chapel. The directive provided:

In the near future you will be contacted concerning white prayer robes which may be in your possession at this time. These white prayer robes are to be submitted to the Chaplain, who shall store the robes in the institution Chapel for useage in the Chapel *only*.

*Effective: Thursday, December 1, 1977*, the white prayer robes shall be considered contraband, if discovered in any inmate's cell and/or working area, and shall be confiscated. Moreover, possession of a white prayer robe in any area other than the Chapel will result in a Rules Infractions Board ticket for the inmate who has it.

This order shall remain in effect until revised or rescinded in writing by the Institution Deputy Superintendent of Custody.

Jt. App. at 30. Only white robes were affected. Appellant Akbar was permitted to keep a black prayer robe in his cell even after the directive was issued.

Appellants contend that Marshall imposed the restriction in response to an October, 1977 incident in which Hugh Cline, a prison guard, allegedly took one of the white robes and used it to frighten an inmate by making him believe that a Ku Klux Klan member was pursuing him (the "KKK incident"). In an affidavit, Superintendent Marshall justified the directive on several grounds:

3. I am familiar with the "white prayer robe" incident of October, 1977, which forms the basis of this lawsuit.

  *   *   *   *   *   *

6. This directive was issued not as a punitive measure but rather as a control mechanism to guard against incidents such as the one which forms the basis of this lawsuit.

7. Furthermore, the removal of the robes from the inmate's cells and working areas was an action calculated to enhance the security of the institution.

8. The prayer robes which are the subject of this lawsuit are loose-fitting and bulky and consequently, may be used to conceal weapons, contraband and foodstuffs within the institution.

9. Visiting free world Muslims often enter the institution in prayer robes. Consequently, the wearing of prayer robes by the inmates would increase the possibility of an inmate surreptitiously walking out of the institution dressed in civilian clothing.

10. The prayer robes could be easily modified by inmates to resemble other forms of civilian dress, including white medical garb.

11. There exists a color-coding system for the clothing of inmates confined in various areas of the institution at S.O.C.F.

12. Inmates in the general population wear blue, inmates with food service and medical service wear white,

and death row inmates (prior to the transfer-out of the last death row inmates in June of this year) wear a white shirt and blue denim trousers with 1½ inch read [sic] striping.

13. The unrestricted wearing of prayer robes by S.O.C.F. inmates would entirely frustrate this color-coding mode since prison-issue clothing would not be visible under the robes.

14. A breakdown in our color-coding system occasioned by the unrestricted wearing of prayer robes by inmates would presumably result in more inmates being found out of place and would diminish the security posture of this institution.

15. It was not my intention at the time of issuance of the prayer robe directive, nor is it my intention now, to completely deprive any inmates of access to prayer robes. Rather, my intention was, and remains, to insure access to the robes in a controlled religious setting in a manner consistent with the security objectives of this institution.

Jt. App. at 55–57.

On June 13, 1978, Azim and Akbar filed a *pro se* action [1] under 42 U.S.C. §§ 1983 and 1988 in the United States District Court for the Southern District of Ohio, alleging that Hugh Cline, "Lt. Kenderson" (later identified as Lt. Kinnison) and other unknown SOCF officers had violated appellants' constitutional rights and their rights under Ohio Rev. Code §§ 2927.11 and 2921.45. Appellants were subsequently permitted to amend their complaint to add Superintendent Marshall and L.E. Rupp, another prison administrator, as defendants. In June, 1980, the court granted partial summary judgment in favor of defendants on counts of the complaint concerning Cline's alleged misappropriation of the robe and disciplinary measures taken against Azim for allegedly possessing a white robe after the directive had been issued. The only ques-

tion remaining in the suit concerned the constitutionality of Marshall's directive restricting possession and use of the white robes to the prison chapel. This issue was referred to a magistrate.

The magistrate recommended granting summary judgment in favor of defendants Cline, Kinnison, and Rupp, leaving Superintendent Marshall as the only defendant. The district court adopted that recommendation on August 26, 1982. Dismissal of those parties has not been appealed.

On November 24, 1982, the magistrate recommended denying the motion for summary judgment on the constitutionality issue, finding that a genuine issue of fact remained. Specifically, the magistrate questioned the defendant's credibility in asserting the necessity of the restriction. He stated: "the Plaintiffs were not denied the use of black prayer robes in the practices of their religion. It is difficult for the Court to comprehend why the reasons asserted to support the restriction of white prayer robes do not apply to black robes." *Azim Abdullah, et al. v. Lt. Kinnison, et al.,* No. C–1–78–363, Report and Recommendation of United States Magistrate at 3 (S.D. Ohio Nov. 24, 1982).

On April 6, 1983, Judge Rubin refused to adopt the magistrate's November 24, 1982 recommendation and ordered summary judgment in favor of all defendants. Relying on *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), Judge Rubin held that the directive in question was a permissible exercise of the discretion granted prison officials to administer penal institutions and that their actions did not violate appellants' First Amendment rights. Judge Rubin wrote:

The determination of what is appropriate garb to be worn inside of a prison is, in this Court's opinion, a "judgment call" by the operating officials. Such a determination does not, as a matter of law, impinge upon plaintiffs' First Amendment rights particularly in view of the

---

**1.** Appellants proceeded *pro se* until January, 1983, when two attorneys entered an appear-

ance as their counsel. Appellants were represented in this appeal.

determination that the apparel in question is not prohibited but limited to specific locations.

*Azim Abdullah, et al. v. Lt. Kinnison, et al.,* No. C–1–78–363, slip op. at 3 (S.D. Ohio April 6, 1983). This appeal followed.

On appeal, appellants contend that the challenged directive was an impermissible, exaggerated response to a legitimate security interest and that it violated a consent decree entered in *Haynes v. State of Ohio,* No. 72–223, slip op. (S.D.Ohio Sept. 7, 1973). They also argue that Superintendent Marshall's affidavit was not a sufficient basis for the grant of summary judgment.

## II.

As Justice Stewart wrote in *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), "[w]e start with the familiar proposition that '[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' " *Id.* at 822, 94 S.Ct. at 2804 (quoting *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed.2d. 1356 (1948)). Prisoners clearly continue to enjoy certain First and Fourteenth Amendment rights, including the right of religious freedom, even while incarcerated. *Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *Cooper v. Pate,* 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964). However, the fact of confinement, the desire to implement legitimate penological policies and goals and the need to maintain institutional security, order, and discipline may limit the exercise of those rights. *Pell v. Procunier,* 417 U.S. at 822–23, 94 S.Ct. at 2804; *Bell v. Wolfish,* 441 U.S. 520, 546–47, 99 S.Ct. 1861, 1877–78, 60 L.Ed.2d 447 (1979).

> [A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law.

*Pell v. Procunier,* 417 U.S. at 822, 94 S.Ct. at 2804. Therefore, when a prisoner challenges a prison regulation that restricts his First Amendment right of religious freedom, "he is entitled to have a court balance his constitutional claims against legitimate state interests in operating its prisons.' *Brown v. Johnson,* 743 F.2d 408, 411 (6th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1190, 84 L.Ed.2d 336 (1985).

Here the burden imposed on appellants' First Amendment rights by Superintendent Marshall's directive is a limited one. That directive merely restricts the use of the Hanafi Muslim's white prayer robes to the prison chapel. Appellants do not contend that the prison officials have limited the exercise of their religious freedom in any other manner. Specifically, appellants have raised no complaints concerning any burden on their right of prayer, other than their claim that the ban on white prayer robes outside the chapel in some way impinges that right.

In his official affidavit Superintendent Marshall advanced a number of justifications for this restriction. First, Superintendent Marshall acknowledged that the directive's issuance was triggered by the incident involving the alleged use of a white robe by a guard to frighten an inmate (the KKK incident). Indeed, he stated that the directive was issued in part to guard against similar incidents in the future. He also asserted that the robes posed a security risk in several other respects, because the robes could: (1) be used to conceal weapons, contraband, and foodstuffs; (2) allow a prisoner to walk out of the prison dressed as a civilian Muslim; (3) be modified to resemble other civilian dress; or (4) frustrate the color-coded clothing system which identifies SOCF inmates.

These security interests are legitimate and on their face provide adequate justification for the limited restriction of appel-

lants' First Amendment rights. Maintaining security in a maximum security institution like SOCF is especially crucial, and we must allow prison officials to adopt and execute those policies necessary to preserve institutional security, order, and discipline. *Bell v. Wolfish,* 441 U.S. at 547, 99 S.Ct. at 1878; *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 132, 97 S.Ct. 2532, 2541, 53 L.Ed.2d 629 (1977). As Judge Martin stated in *Brown v. Johnson,*

> we will try not to second-guess prison administrators on matters relating to prison security, even when those matters affect the constitutional rights of inmates in a manner we find discomforting.... As long as prison authorities present evidence to support their judgment that prison security will be undermined in the absence of a challenged regulation, we will not substitute our judgment for theirs....
>
> ... Moreover, prison officials, when making these types of decisions, need not demonstrate an *actual* danger in order to support the reasonableness of their determinations. It is enough to show that a *potential* danger exists without the restrictions of a challenged prison regulation.

743 F.2d at 412–13 (emphasis in original).

Appellants, however, contend that while the directive is supported by security interests which appear legitimate and permissible, they are actually pretextual. In essence, appellants claim that the directive was merely an impermissible, "exaggerated" response to the KKK incident. In *Pell v. Procunier,* 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974), the Supreme Court stated that courts should ordinarily defer to prison officials' judgment regarding security considerations only "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations." Here appellants assert that the directive was just such an exaggerated response to the KKK incident and that the other justifications cited by Superintendent Marshall were "window dressing" devised after the fact to justify the officials' action.

To support this argument, appellants point out that the directive only applies to white robes, leaving intact possession and use of other robes which could pose just as great a security risk. Appellants further allege that the color-coded clothing system was established several years after the directive was issued and, thus, could not have served as a basis for the directive. They contend that because of these apparent inconsistencies, the directive was only an exaggerated and punitive response to an unfortunate incident for which they were not responsible.

■ At first glance the distinction between white and non-white robes can appear somewhat unreasonable or at least illogical. However, we cannot quarrel with the prison administration's judgment in not restricting access to any other robes. So far as we are aware, Akbar's one black robe is the only non-white robe kept by a prisoner in a cell. We do not see the prison officials' tolerance of one, three-quarter length, black robe owned by a leader of the Hanafi sect as indicative of an exaggerated or punitive response in the restriction upon white robes. Instead, we view the action as an intelligent effort to use the least restrictive means necessary for security. Such attempts to accommodate First Amendment rights are to be encouraged, not penalized. *See Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 133, 97 S.Ct. 2532, 2541, 53 L.Ed.2d 629 (1977). The directive is not unconstitutional merely because only possession of white robes is affected.

■ We also believe that the directive was fully justified by the stated security interest even without any consideration of a need to protect the color-coding system. The inclusion of that interest, which could not have been a factor in the decision made in 1977, does not affect the validity or importance of the other justifications cited in Superintendent Marshall's affidavit. The other security interests advanced by Superintendent Marshall were legitimate and provided a satisfactory basis for the

issuance of the directive. Certainly color-coding as a proper means of maintaining prison security is not to be condemned merely because it was instituted after the directive was issued.

Appellants correctly note that the KKK incident was no fault of theirs and that blame should be placed upon the prison guard who perpetrated it. We agree. The most charitable view that can be taken of the incident is that it was a sick joke by a prison guard who was insensitive to the repugnant impact such historic symbolism would have, particularly on the black inmates of the institution. However, the discipline of the guard is not before us, and the incident is relative only to whether the restriction upon appellants' rights was an unfair and punitive retaliation for reporting the incident. After careful consideration, we conclude that the remote possibility that the directive was retaliatory does not justify interfering with what was otherwise a proper exercise of the prison officials' discretion. We find the following language from *Hewitt v. Helms*, 459 U.S. 460, 474, 103 S.Ct. 864, 872–73, 74 L.Ed.2d 675 (1983), particularly appropriate:

> As we said in *Rhodes v. Chapman*, 452 U.S. 337, 349, n. 14 [101 S.Ct. 2392, 2400, n. 14, 69 L.Ed.2d 59] (1981), "a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators." In assessing the seriousness of a threat to institutional security, prison administrators necessarily draw on more than the specific facts surrounding a particular incident; instead, they must consider the character of the inmates confined in the institution, recent and longstanding relations between prisoners and guards, prisoners *inter se*, and the like. In the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents. The judgment of prison officials in this context, like that of those making parole

decisions, turns largely on "purely subjective evaluations and on predictions of future behavior," *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 464 [101 S.Ct. 2460, 2464, 69 L.Ed.2d 158] (1981); indeed, the administrators must predict not just one inmate's future actions, as in parole, but those of an entire institution.

We will not second-guess the prison administration's actions in restricting access to the prayer robes. The directive did not constitute an exaggerated and hence constitutionally impermissible response to that incident.

We note that the only other circuit court to consider this question reached the same result. In *Rogers v. Scurr*, 676 F.2d 1211 (8th Cir.1982), the Eighth Circuit reversed a district court order requiring two prisons to allow Muslim inmates to wear caps and robes at all times unless good cause for the prohibition of the clothing could be shown. The court found that the prohibition on wearing the caps and robes outside religious services was within the discretion of the prison authorities who said the ban was necessary because "such attire makes it too easy to conceal contraband." *Id.* at 1215. The court concluded that "no constitutional right of the prisoner was violated by the prohibition on wearing prayer caps and robes outside religious services." *Id.* at 1216. Our decision here is in agreement with that of the Eighth Circuit in *Rogers*.

### III.

■ On appeal, appellants also contend that the restriction of the prayer robes to the chapel violated a consent decree entered in *Haynes v. State of Ohio*, No. 72–223, Consent Order and Order of Dismissal (S.D. Ohio Sept. 7, 1973). The consent decree basically ordered the State of Ohio to allow Sunni Muslims incarcerated in Ohio prisons to practice their religion. In the *Haynes* consent decree the defendants (including the State of Ohio) agreed that

> 1. *Except as compelled by security considerations and budgetary con-*

*straints applicable to all inmates*, the Defendants are ordered to permit the Plaintiffs and other prison inmates (hereinafter referred to as the class of Plaintiffs) under the custody and control of Defendants, to practice or worship the Sunni Muslim faith with the same freedom and rights as Christians and followers of other religions may practice and/or worship their faith. The freedom and rights ordered hereby include the freedom and right to ... gather and engage in individual or congregational Sunni Muslim prayer; and to observe the ... hair and clothing standards, diet and other evidences of the Sunni Muslim faith ....

*Id.* at ¶ 1 (emphasis added).

This issue was raised by the appellants below but it was not decided by either the magistrate or the district court in their disposition of the case. Indeed, appellants' references to *Haynes* in the district court were almost in passing and for the most part treated the *Haynes* consent decree as precedent to be followed by the court rather than a contract between the parties to this appeal. However, because the issue was raised below, we will consider it briefly here.

Assuming that the appellants may enforce the *Haynes* consent decree as "other prison inmates" whom the decree was intended to benefit, it is clear from the face of the decree that it does not prohibit the prison officials' actions here. First, the decree limits the practice of the Sunni Muslim faith when "security considerations" are involved. Thus, the same security interests which support Superintendent Marshall's directive on constitutional grounds also justify the directive under the consent decree. Second, appellants' religion has not been singled out for any improper reason. Finally, Superintendent Marshall's directive imposes only a limited restriction on appellants' right to practice their religion. Other than being allowed to wear white prayer robes only in the prison chapel, appellants do not claim any infringement of their right "to practice or worship the Sunni Muslim faith with the same freedom and rights as Christians and followers of other religions." The consent decree has not been violated here.

## IV.

We note briefly that appellants' only remaining argument, that is, that Superintendent Marshall's affidavit was inadequate and that the case was not ripe for summary judgment, is without merit. The affidavit met the requirements of the Federal Rules of Civil Procedure and supported Judge Rubin's summary judgment order. This case was otherwise ripe for summary judgment.

Finally, appellees have argued that the motion for summary judgment in their favor below may also be upheld on the grounds that they were entitled to qualified immunity under *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Because we hold that the appellees' action was not unconstitutional, we need not and do not reach this issue.

AFFIRMED.