**Homer REED, Plaintiff,**

**v.**

**Gordon FAULKNER, Jack Duckworth, Ron L. Batchelor, Indiana Attorney General, Defendants.**

**No. S 84–575.**

United States District Court, N.D. Indiana, South Bend Division.

Feb. 24, 1987.

Fred S. Mott, Legal Asst., Michigan City, Ind., for plaintiff.

David L. Steiner, Deputy Atty. Gen., Indianapolis, Ind., for defendants.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

### I.

The First Amendment of the Constitution of the United States provides:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

One of the multitude of judicial challenges that emanate from the few simple words in the First Amendment has to do with working out the free exercise rights of inmates imprisoned in a state maximum security prison. This court has previously attempted to meet that challenge as indicated in *Childs v. Duckworth*, 509 F.Supp. 1254 (N.D.Ind.1981), *aff'd*, 705 F.2d 915 (7th Cir.1983). *See also* cases collected in "Provision for Religious Facilities for Prisoners", 12 ALR 3d 1276. In *Shabazz v. O'Lone*, 782 F.2d 416, 420 (3d Cir.1986), *cert. granted*, — U.S. —, 107 S.Ct. 268,

93 L.Ed.2d 245 (1986), Judge Arlin Adams stated:

Federal courts must afford deference to decisions by prison officials in areas concerning security, but where first amendment values are implicated such deference must be tempered by an effort to accommodate free exercise values.

The strong dissent in both *Childs* and *Shabazz* are indicative of the difficult task that is involved in reconciling the legitimate security needs of a maximum security prison with the free exercise values that are inherent in the First Amendment of the Constitution of the United States.

Approximately four months ago in this circuit, Judge Shadur provided detailed insight in a carefully drafted opinion in *Williams v. Lane*, 646 F.Supp. 1379 (N.D. Ill.1986). The case involved the free exercise rights of inmates in protective custody. The court held that prison authorities abridged the inmate's free exercise rights in their religion because there was a failure to provide an opportunity to pray communally, a denial of opportunity to participate in the rituals of their religious faith, and a deprivation of reglious counseling and instruction.

The Court of Appeals for this circuit, speaking through Senior Judge Eschbach, in the context of the Federal Bureau of Prisons' maximum of all maximum security prisons at Marion, Illinois, in *Caldwell v. Miller*, 790 F.2d 589, 595–597 (7th Cir. 1986), stated:

Lawful incarceration necessarily brings with it the restrictions of many privileges and rights. *Hudson v. Palmer* 468 U.S. 517, [524], 104 S.Ct. 3194, 3199, 82 L.Ed.2d 393 (1984); *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979); *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). The right to the free exercise of religious beliefs, nevertheless, does not abate upon imprisonment. *Hudson*, 468 U.S. at [523], 104 S.Ct. at 3198; *Cruz v. Beto*, 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 1081 n. 2, 31 L.Ed.2d 263 (1972) (per curiam); *Childs*, 705 F.2d at

920; *Madyun v. Franzen,* 704 F.2d 954, 960 (7th Cir.), *cert. denied,* 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983). That right may, of course, be restricted in order to achieve legitimate correctional goals and to maintain institutional security. *Bell v. Wolfish,* 441 U.S. at 546–47, 99 S.Ct. at 1877–78; *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974); *Pell,* 417 U.S. at 822–23, 94 S.Ct. at 2804; *Childs,* 705 F.2d at 920; *Arsberry v. Sielaff,* 586 F.2d 37, 44 (7th Cir.1978). We must, however, carefully scrutinize prison restrictions that affect an inmate's free-exercise rights "to ascertain the extent to which they are necessary to effectuate the legitimate policies and goals of the correction system." *Childs,* 705 F.2d at 920. Prison rules that restrain the free exercise of religion are justified only if they are "reasonably adapted" to achieving an important penological objective. *Madyun,* 704 F.2d at 960; *see also LaReau v. MacDougall,* 473 F.2d 974, 979 (2nd Cir.1972), *cert. denied,* 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973).

We accord, as we must, prison officials wide-ranging deference in adopting policies that are needed to preserve internal order and security, *Hewitt v. Helms,* 459 U.S. 460, 474, 103 S.Ct. 864, 872–73, 74 L.Ed.2d 675 (1983); *Bell v. Wolfish,* 441 U.S. at 547–48, 99 S.Ct. at 1878; *Pell,* 417 U.S. at 827, 94 S.Ct. at 2806, and we will not substitute our judgment for theirs "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations." *Pell,* 417 U.S. at 827, 94 S.Ct. at 2806; see *Block v. Rutherford,* 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984); *Hewitt,* 459 U.S. at 467, 470, 103 S.Ct. at 869–70; *Bell v. Wolfish,* 441 U.S. at 547–48, 554–55, 562–63, 99 S.Ct. at 1878–79, 1882–83, 1886–87. This does not mean, however, that it is appropriate for us to defer completely to prison administrators. *Madyun,* 704 F.2d at 959. By requiring that a prison regulation or policy be reasonably adapted to an important correctional goal, we

protect the legitimate interest of prisoners in adhering to their religious beliefs and give guidance to prison administrators in adopting policies that comply with constitutional standards, while at the same time appropriately deferring to their judgment in matters related to institutional security. *Id.*

The First Amendment issue which confronted Judge Eschbach and that panel of the Court of Appeals in *Caldwell* dealt with a complete and continuing ban on group religious activities at the maximum security Marion facility. The court neither upheld nor struck down the aforesaid ban, which was initiated for the announced purpose of preserving order and authority. However, the court held that the district court's grant of summary judgment on the free exercise claim required reversal and remand to consider the issue of whether the total ban on all religious activities was reasonably adapted to legitimate security considerations at the Marion facility.

This case was tried at the Indiana State Prison on November 13 and 14, 1986. As suggested by the resolution of the Seventh Circuit Judicial Council on October 4, 1984, briefs were filed and exchanged and this case is ripe for ruling. This court has given and will give the appropriate deference to this *pro se* plaintiff under the mandates of *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). This plaintiff did not request appointed counsel. It is the intent of this memorandum to comply with the mandates of Rule 52 of the Federal Rules of Civil Procedure.

## II.

The issues in this case are narrower and considerably more refined than the factual record appears in *Caldwell v. Miller.*

Certainly at one end of the secular spectrum, the Supreme Court of the United States has held that the regulations regarding the grooming of the police department in Suffolk County, New York, did not infringe upon liberty interests reflected in the Fourteenth Amendment of the Constitution of the United States. *See Kelly v.*

*Johnson*, 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976). Certainly it is without dispute that as a general proposition the managers of an all male maximum security state prison can regulate the length of hair and beards of those inmates. *See Hill v. Blackwell*, 774 F.2d 338 (8th Cir.1985); *Wilson v. Schillinger*, 761 F.2d 921 (3d Cir.1985); *Cole v. Flick*, 758 F.2d 124 (3d Cir.1985); *Robinson v. Foti*, 527 F.Supp. 1111 (E.D.La.1981); and *Theriault v. Silber*, 453 F.Supp. 254 (W.D.Texas 1978). The Indiana D.O.C. has the authority to issue regulations in regard to an inmate's personal hygiene pursuant to Indiana Code § 11–11–4–2 which reads:

> Sec. 2 The department may supervise and contral the hygiene, grooming, and attire of confined offenders to the extent reasonably necessary to maintain a sanitary, safe, and secure environment. *As added by Acts 1979, P.L. 120, SEC. 4.*[1]

Thus, the question narrows in this case as to whether the aforesaid regulation infringes upon the free exercise rights of the plaintiff who is an inmate incarcerated at the Indiana State Prison. In order to decide that question this court needs to examine the following:

1. What is the general and specific nature of this inmate's religious beliefs?

2. Are those religious beliefs specific or general as to the length and management of human hair?

3. Is this plaintiff sincere in his religious beliefs?

4. Is this particular set of beliefs a "religion" to be protected by the First Amendment of the Constitution of the United States?

5. Are there overriding administrative and security interests in the institution that circumscribe the professed free exercise conduct in this case?

**A.**

There were two books provided by the plaintiff in the course of this trial which were examined by the court. The Court has since secured copies of these book from a public library for examination. One book is by Tracy Nicholas, *Rastafari, A Way of Life* (New York 1979). The other is by Leonard Barrett, *The Rastafarians* (Boston 1977). Leonard Barrett is also the author of *The Rastafarians, A Study in Messianic Cultism in Jamaica* (Puerto Rico 1968). The court has also secured and examined a publication by Smith, Augier and Nettleford, called *The Report on the Rastafari Movement* (1960).[2]

For want of a better term, the aforesaid books are generally in the area of either social psychology or cultural anthropology. Perhaps they might be considered to be in the area of comparative religion. None of these books are in any way intended to be statements of faith in the sense that the Bible or the Koran are such.

In this case the plaintiff contends that he became interested in Rastafari principally through reading the Barrett and Nicholas books some six or seven years ago. The plaintiff contends that it is a part of the doctrinal faith of this religious group to wear "dreadlocks". Tracy Nicholas states that while the wearing of dreadlocks is not mandatory, it is popular. See Nicholas, supra, at p. 34.

**B.**

This court has had the advantage of reviewing a number of opinions dealing with the free exercise of Rastafari in the context of a prison setting. See *Benjamin v. Coglin*, 643 F.Supp. 351 (S.D.N.Y.1986). At the Court of Appeals level one case dealt specifically with the Rastafari religion. *See Wilson v. Schillinger*, 761 F.2d 921 (3d Cir.1985). With regard to the inter-

---

**1.** D.O.C. policy 02–00–106 provides:
hair is to be kept neat and clean and well-groomed at all times. Hair of male offenders must not touch the collar, extend over the eyebrows, or cover the ears.

**2.** The general outlines of Rastafarianism are well summarized in *The Encyclopedia of Religion*, Vol. 3, pp. 95–97 (MacMillan 1987) which is attached hereto as Appendix A.

play between the free exercise of religion and the correctional grooming policy as to inmates, see *Cole v. Flick,* 758 F.2d 124 (3d Cir.1985) and *Hill v. Blackwell,* 774 F.2d 338 (1985). *Cole* deals with a Cherokee native American and *Hill* deals with a Muslim.

In addition to the testimony of the plaintiff, this court had before it the testimony of Ray Bloomer who provided expert testimony in the area of comparative religion which this court credits and believes. Witness Bloomer summarized helpfully the Barrett book on the Rastafarians and testified that dreadlocks are not universal among Rastafarians although they predominate. Bloomer testified that the hair style appears to be a matter of personal choice but rather than an ironclad tenet of the religion. The grooming policy at the prison is reasonably flexible, permits beards, and indicates that hair on the head should not entirely cover the ears, touch the collars, or extend over the eyebrows. Braided hair and so-called Afro styles are also allowed.

The most recent case that this court has discovered in regard to Rastafari religion is *Benjamin v. Coglin, supra,* decided August 29, 1986. The decision is primarily based on the doctrine of collateral estoppel since the issue had been submitted to two different courts in the State of New York. Under the basic teaching of *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). *Benjamin* was decided on issue preclusion. Certainly the underlying state court cases in New York are entitled to this court's respectful attention. However, under the Fourteenth Amendment as well as § 1983, this court is not bound by those cases and is not bound by the reasoning and result of *Benjamin v. Coglin.*

At the other end of the spectrum is the opinion of Judge Schwartz in *Robinson v. Foti,* 527 F.Supp. 1111 (E.D.Louisiana 1981), who confronts directly but briefly the First Amendment issue and finds that the regulation regarding personal hygiene and grooming should be upheld under the authority of *Brooks v. Wainwright,* 428 F.2d 652 (5th Cir.1970), and *Theriault v. Silber,* 453 F.Supp. 254 (W.D.Texas 1978). While upholding the personal hygiene and grooming regulation, Judge Schwartz raises a question of whether the Rastafari are more of a Jamaican social and political subculture rather than a religion. However, Schartz did not squarely decide that the Rastafarian belief is not a religion within the First Amendment.

The case of *Wilson v. Schillinger,* 761 F.2d 921 (3d Cir.1985) is more relevant here because of its facts and reasoning. The hair length described in footnote 2 at page 923 is probably more restrictive than those involved here. The Court assumed that Rastafari was a religion which abided by the dictates of the Old Testament and forbade sharp objects from touching the hair on their bodies. The court assumed, without any challenge, that the beliefs involved constituted a religion and that such beliefs were sincerely held. That assumption affirmed the assumption of the district court. Citing *Jones v. North Carolina Prisoner Labor Union,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977), the court further held that a prisoner's exercise of First Amendment freedoms may be curtailed when in the informed judgment of prison officials such exercise poses the likelihood of disruption to prison order or stability or otherwise interferes with the legitimate penological objectives of the prison environment. In *Wilson* the district court had reasoned that the particular hair regulations impermissibly interfered with that plaintiff's freedom to practice his religion. However, that decision was vacated by the Third Circuit and judgment was entered thereon for the defendants. Although the directive conflicted with plaintiff's religious beliefs, the Court reasoned that the directive in question could be enforced against the plaintiff because the directive responded to potential dangers to prison security. In a parallel case, the Third Circuit ruled that an inmate who was the son of a Caucasian mother and a Cherokee (American) Indian father and who adhered to the native American (Indian) religion and the traditional religious beliefs embodied

therein could not claim the free exercise thereof in the face of a state prison regulation which required this inmates to maintain their hair length above the collar. *See Cole v. Flick*, 758 F.2d 124 (3d Cir.1985). In reaching its decision, the Third Circuit again concluded that the beliefs were religious in character and were sincere. Its conclusion is stated in the final paragraph of the opinion at page 131 as follows:

The beliefs asserted by Cole are religious in character. They are also sincere. Because convicted prisoners do not forfeit constitutional protections, Cole's protected rights may not be unduly or unjustifiably impinged. Indeed, in the prison setting, with all its attendant deprivations, the right to pursue one's religious beliefs may assume even greater significance than elsewhere. We thus do not denigrate Cole's position. Under *St. Claire* [v. *Cuyler*, 634 F.2d 109 (3rd Cir.1980)] and *Dreibelbis*, [v. *Marks*, 742 F.2d 792 (3rd Cir.1984)], however, once the state proffers sincerely held and arguably correct beliefs regarding the necessity of a regulation that impinges upon the first amendment rights of a prisoner—which the Commonwealth has done here—the burden is on the prisoner to make a showing by substantial evidence that these beliefs are unreasonable or that the regulation is an exaggerated response. Cole clearly has not done so here. We will, therefore, reverse the judgment of the district court and remand the case with directions that judgment be entered for the appellant.

In *Hill v. Blackwell*, 774 F.2d 338 (8th Cir.1985), the plaintiff was an inmate at the Missouri State Penitentiary and was a member of the Muslim faith. The practice of wearing facial hair, including beards and mustaches, is a practice of the Muslim religion. A regulation promulgated by the Department of Corrections of the State of Missouri prohibits inmates in Missouri penal institutions, exclusive of certain minimum security facilities, from growing beards. The plaintiff challenged this regulation on the basis of the free exercise clause and the United States district judge hearing the case agreed. A divided Court of Appeals reversed and held that the regulation was not undermined by the First Amendment. The majority concluded:

"[A] prison inmate retains those First Amendment Rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell*, 417 U.S. at 882, 94 S.Ct. at 2804. Other than being denied an exemption from the beard regulation, Hill has been accommodated in the practice of his religious beliefs. He is permitted to observe Ramadan, a month of fasting and self-denial; he has served as an imam, a religious leader selected on the basis of his knowledge of the faith; he is permitted to participate regularly in prayer services; he has a collection of books about the Muslim religion in his cell; and he regularly counsels with the Muslim chaplain. He is also permitted to grow sideburns and a moustache in accordance with the Muslim practice of growing facial hair. Thus, the grooming regulation in question is "an intelligent effort to use the least restrictive means necessary for security. Such attempts to accommodate First Amendment rights are to be encouraged, not penalized." *Abdullah v. Kinnison*, 769 F.2d 345, 350 (6th Cir. 1985) (per curiam).

"The fact of confinement and the needs of the penal institutions impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration." *Jones*, 433 U.S. at 125, 97 S.Ct. at 2537. The prison officials have concluded that the prison grooming regulation prohibiting inmates from growing beards is necessary to the maintenance of institutional security at the Missouri State Penitentiary. It is enough to say that their response to this legitimate security consideration has not been shown to be exaggerated. We reverse.

Again, the delicacy of the values involved provoked a dissent not unlike the one in the

Third Circuit, and Judge Cudahy's dissent in the *Childs* case.

In another very recent Eighth Circuit case, a Muslim inmate claimed the denial of the free exercise of religion when the Arkansas Department of Corrections refused to allow him and other Muslims to conduct religious services except under the leadership of an approved free world sponser. The inmate also claimed that the prison officials provided them with an inadequate sack lunch during the daily Ramadan feast. The Eighth Circuit held that summary judgment against the inmate was appropriate because the regulation requiring approved free world sponsor for religious services was a reasonable response to legitimate security considerations. *See Tisdale v. Dobbs*, 807 F.2d 734 (8th Cir.1986). In *Udey v. Kastner*, 644 F.Supp. 1441 (E.D. Texas 1986), the district court held that the religious dietary demands of the plaintif would place an undue burden on the penal system as a result of cost, security problems, difficulty of administering the diet, and a proliferation of similar requests and that the same did not violate the free exercise clause of the First Amendment. That court cited and relied on *Childs v. Duckworth, supra.*

This court will give the benefit of the doubt to this plaintiff and will assume, for purposes of this opinion, that the beliefs proclaimed as Rastafari are sufficiently identifiable to be protected by the First Amendment of the Constitution of the United States.

### C.

The question of the plaintiff's sincerity is more complex and difficult to ascertain. This court saw and heard the plaintiff testify under oath and there can be no doubt that he had read the books that he presented to the court and understood their contents. The determination of religious sincerity is profoundly difficult. It involves a good deal more than adhering to the rather simplistic instructions that district courts regularly give juries in the area of credibility. For example, see Seventh Circuit Pattern Instruction Number 1.02:

> You are the sole judges of the credibility of the witnesses, and of the weight to be given to the testimony of each of them. In considering the testimony of any witness, you may take into account his intelligence, his ability and opportunity to observe, his age, his memory, his manner while testifying, any interest, bias or prejudice he may have, and the reasonableness of his testimony considered in the light of all the evidence in the case.

See also Devitt and Blackman, *Federal Jury Practice and Instruction*, Vol. 1, Sec. 17.01. Determining religious sincerity certainly involves an opportunity to see and hear the plaintiff witness testify, to be examined and be cross-examined. Certainly it involves an understanding of the basic tenets of the particular religion. For example, Judge Schwartz, in the *Robinson* case, faulted the plaintiff because of his basic lack of knowledge of the history, teaching and practice of Rastafari. In that case the plaintiff made no mention of Haile Selassie and was unfamiliar with Marcus Garvey, a powerful black leader from Jamaica, who was often regarded as the architect of the Rastafari philosophy. Certainly the plaintiff here cannot be faulted in the same vein. A determination of sincerity must go even farther than observable credibility and an understanding of religious doctrine. It is the proper province of a court to determine in some way whether statements and conduct have been consistent with the professed beliefs. Certainly this court and no court can realistically expect perfect moral purity of any adherent to any religion. Human history and, indeed, the teaching of major religions of the world in and of themselves tell us that most mortals are fallible and do not always live up to the highest moral ideals of their religious faith. Religious sincerity is the most difficult of all forms of credibility for a trial judge to determine. When Galileo recanted before the Cardinal/Judges in 1633, his hearers may well have thought it was a manifestation of religious sincerity. Later events certainly indicate that his own

deepest convictions were contrary to his public proclamation.[3]

When one considers the complex factors that must be determined on the sincerity question, they are difficult to sort out. In a general sense, there can be no doubt that this plaintiff is acquainted with and sincerely interested in the Rastafarian teaching. However, this court has the very strong feeling that in the narrow confines of this case, the plaintiff is using this religion as an excuse to violate a regulation regarding the length of his hair. To that extent his sincerity is questionable at best. As indicated, this court tends to credit that part of the expert testimony which indicates that the particular hair style in question, while commonplace among adherents to this religion, is not doctrinally mandated by it.

There can be no doubt that many who adhere to religion have their large and small hypocrisies and courts should not deprecate the hypocrisies of others. The evidence is undisputed, however, that in the areas of the dietary teachings of the Rastafarians, this plaintiff has been a backslider. It is true that this plaintiff became a Rastafarian after entering prison and did not bring those religious beliefs to prison with him. However, that in itself does not preclude a First Amendment protection thereof.

With regard to the treatment of his hair itself, the evidence is clear that this plaintiff has not adhered to what he claims to be the Rastafarian teaching regarding the same. Certainly the length of the plaintiff's beard is inconsistent with what he professes to believe as a Rastafarian. It is thus the conclusion of the court on the narrow question of hair length and grooming that the protestations of religious faith by this plaintiff are less than sincere.

The hair grooming policy here is certainly far more lenient than the one described in the Missouri State Penitentiary in *Hill v. Blackwell*, supra, and is grounded in the fundamentally important penological goals of hygiene and security. The grooming policy is designed to achieve important penological goals and there is no evidence supporting plaintiff's contentions that those goals are exaggerated or unreasonable. The cases cited are clear that a prison inmate must prove that a prison administrator's reasons for requiring haircuts and shaving beards are pretextual and unreasonable even where the tenet of an inmate's religion prohibits the cutting of the hair or beard. As in *Wilson, supra*, there are security and sanitation problems. In *Cole* the inmate failed to carry his burden to show that the reason advanced was unreasonable or exaggerated.

### D.

In the record of this case the following legitimate reasons support the hair grooming regulations and prhohibition of the dreadlock style advocated and worn by the plaintiff: a security concern for the potential use of long hair for concealing and moving contraband; a security concern for potential racial conflict from the professed Rastafarian belief that dreadlock symbolizes black superiority; a safety concern for the potential danger of long uncombed hair getting caught in machinery or cell doors; a public health and sanitation concern arising from the increased risk of infection and lice both to the dreadlocked inmate and to other inmates are clear; and finally, the disciplinary problems that arise from allowing an exception from the hair policy for some inmates and complaints about that exception by others.

After a careful review of the evidence, the arguments of the parties and the delicacies of the values involved, this court has concluded that there is no basis presented for relief in this case under 42 U.S.C. § 1983. Any such requested relief is now DENIED. Costs are assessed against the plaintiff. Judgment shall enter for the defendants and against the plaintiff. IT IS SO ORDERED.

---

**3.** *The Encyclopedia of Religion*, Vol. 5, pp. 465–467 (MacMillan 19878) *New Catholic Encyclopedia*, Vol. 6, pp. 250 et seq. "Rehabilitating Galileo's Image", *Time*, March 12, 1984, p. 72.

## APPENDIX A

*Rastafarianism.* An important factor underlying the rise of Rastafarianism is that, since at least the beginning of the twentieth century, Jamaican blacks have identified with Ethiopia on account of its biblical symbolism. The verse most often cited is *Psalms* 68:31: "Princes come out of Egypt; Ethiopia shall soon stretch out her hands unto God." Between 1904 and 1927, Ethiopianism came to the attention of Jamaicans through several essays, articles, and books published in Jamaica and in the United States. The early 1930s saw the founding of a number of associations for black people and the emergence of the Rastafarian movement, named after Ras ("prince") Tafari, who was crowned emperor Haile Selassie of Ethiopia (Abyssinia) in November 1930. Marcus Garvey had formed the Universal Negro Improvement Association in Jamaica in 1914, and his doctrine of racial redemption, together with the coronation of Haile Selassie, furthered interest in the Ethiopian tradition (Hill, 1980).

Since emancipation, persons on the lower rungs of Jamaican society have struggled continuously against exploitation. Higher wages, the granting of civil and political rights, and other gains have come slowly, and often against bitter opposition. In the early 1930s, the basic issues for rural Jamaicans were land, rent, and taxation, and their struggles over these questions gave rise to the millenarian visions of the Rastafarian movement. In that period, Rastafarians were subjected to intense police pressure in Saint Thomas and neighboring parishes. It is likely that the Rastafarian millenarianism, with its vision of black domination, served as a catalyst in bringing about the labor uprisings of 1938 (Hill, 1981).

In 1953, Rastafarianism bore strong resemblance to revivalism in organizational and ritual patterns. The small, independent groups of both movements had similar sets of officers, festivals, and ritual procedures, including the reading of passages from the Bible and the singing of hymns (modified in the case of the Rastafarians to fit the doctrines of the cult), but important differences existed. Drumming, dancing, and spirit possession were prominent features of revivalism, but they never occurred in a Rastafarian gathering (Simpson, 1955). Beards and dreadlocks were present among Rastafarians but were not important aspects of the movement in the early fifties, nor was the place given to gamia (marijuana). Rastafarianism was, however, antiestablishment and bitter on the racial question (Cheyannes, 1977). Revivalism had no political significance in 1953; its adherents were mainly concerned about personal salvation (Simpson, 1956).

According to Rastafarian doctrines in 1953, (1) black people were exiled to the West Indies because of their transgressions; (2) the white man is inferior to the black man; (3) the Jamaican situation is hopeless; (4) Ethiopia is heaven; (5) Haile Selassie is the living God; (6) the emperor of Abyssinia will arrange for expatriated persons of African descent to return to the homeland; and (7) black men will soon get their revenge by compelling white men to serve them (Simpson, 1955). These remain the basic beliefs of the movement, but not all adherents subscribe to all of them, nor do they give them equal emphasis. Rastafarians reinterpret the Old Testament in claiming that they are true present-day prophets, the "reincarnated Moseses, Joshuas, Isaiahs, and Jeremiahs." They also believe that they are "destined to free the scattered Ethiopians who are black men" (Nettleford, 1970, pp. 108–109).

As revivalism began to decline in the mid–1950s, many of its followers were attracted to Rastafarianism and became active participants in the movement, or sympathizers (Smith, Augier, and Nettleford, 1960). Between 1953 and 1960, the Rastafarian movement grew rapidly and became more complex doctrinally. This growth continued through the 1970s and the early 1980s. Membership—both the fully committed and partially committed—came to be drawn from all levels of the society. The more militant Rastafarians insisted that deliverance from poverty, unemployment, and

APPENDIX A—Continued

humiliation must come from forces within Jamaica and not from Haile Selassie or Haile Selassie's spirit. Repatriation to Africa received less emphasis as some bands began to stress black power and "the africanization of Jamaica" (employment, education, and use of the country's resources are to benefit persons of African descent; see Nettleford, 1970; Barrett, 1974; Simpson, 1978).

The militancy of present-day Rastafaranism is seen clearly in its concept of a modern Babylon that includes Britain, the former colonial power; the United States, the present major industrial power; the bourgeois state of Jamaica; and the church. Babylon is said to be the source of Jamaica's misfortunes (Chevannes, 1977). A recent theme of the movement has to do with its concept of nature. In Rastafarian though nature is nonindustrial society; and this underlies certain aspects of Rastafarian lifestyle—for example, dietary rules, uncombed locks and beards, and the importance of *ganja* (Chevannes, 1977).

Since the early 1960s, Rastafarianism has played an important role in the evolution of Jamaican popular music. The rhythm of the Rastafarians' *akete* drums influenced the development of the fast rhythm called *ska*, and the ska form has developed into reggae. Most reggae songs contain caustic social comments, but they also praise Ras Tafari, Jamaican heroes, freedom, and *ganja* (Barrett, 1977; Chevannes, 1977). In the poetry and prose written by contemporary Rastafarians awareness of an African identity and of Africa itself is a main theme (Johnson, 1980).

Rastafarianism is not a unified movement (Campbell, 1980). Many of the brethren gather in small, informal bodies and are not affiliated with organized groups. Many Rastafarians refuse to take part in elections on the grounds that neither of Jamaica's two political parties represents them. In recent times, however, some Rastafarians have played an increasingly active role in politics (Smith, Augier, and Nettleford, 1960; Chevannes, 1977).

Rastafarian culture has spread to other parts of the Caribbean, and Rastafarian art, poetry, music, and philosophy are well known in London, Paris, and other cities in Western Europe and the United States. Rastafarian music has been diffused to a number of African countries (Campbell, 1980).

The dethronement of Haile Selassie in 1974 and his death the following year have not resulted in a decline of the movement. Rastafarianism arose out of certain conditions in Jamaica and in other countries of the Caribbean and has continued because those conditions, as well as the international situation, have not changed appreciably (Barrett, 1977).

[*For West African antecedents of many of the elements in Afro-Caribbean religions, see* Fon and Ewe Religion; Sango; West African Religions; *and* Yoruba Religion.]