**INDIAN INMATES OF the NEBRASKA PENITENTIARY, Plaintiffs,**

**v.**

**Frank GUNTER, Defendant.**

**No. CV72–L–156.**

United States District Court, D. Nebraska.

May 19, 1987.

Dana V. Baker, Lincoln, Neb., for plaintiffs.

Steven J. Moeller, Asst. Atty. Gen., Lincoln, Neb., for defendant.

MEMORANDUM OF DECISION

URBOM, District Judge.

The petitioner, Tatanka SapaNajin (a/k/a Jesse Rouse), is a Native American of the Nakota (Yankton Sioux) Tribe and, at times relevant to this case, was an inmate in the protective custody (PC) unit at the Diagnostic and Evaluation Center (D & E). Frank Gunter is the director of the Nebraska Department of Correctional Services (the Department). SapaNajin was one of the original litigants in this case, which resulted in consent decrees requiring prison officials to make available certain Native American religious, cultural, and educational experiences for inmates.

In his motion for order to show cause why defendant, Frank Gunter, should not be punished for contempt, filing 76, SapaNajin alleged that prison officials have denied him access to certain Native American spiritual practices, provided a Native American spiritual leader whose beliefs are contrary to his and to those of other Native American inmates, failed to provide accredited Native American studies courses, and failed to comply with the Department's affirmative action plan. SapaNajin argues that these alleged practices violate the consent decrees of 1974 and 1976. This case also presents the question whether the various restrictions on religious expression violate the first amendment.

The Sioux people are divided linguistically into the Dakota, Nakota and Lakota, and politically into the seven tribal fires. The sun dance, vision quest, and sweat lodge are among the seven sacred rites common to the Dakota, Nakota, and Lakota. SapaNajin is a sincere follower of the Nakota ways, and believes that God is the "great mystery" who gave the sacred pipe and the sacred rites. He seeks to follow the "good red road" or sacred way, viewing life as a purification ceremony for the after-life.

The sweat lodge ceremony was the first rite given to the Nakota; it is a preparation for all other rites as well as a rite in itself. During sweat lodge ceremonies, participants experience physical and spiritual purification and are "reborn" into harmony through the use of gifts from the helpers and powers that aid in prayer to the great mystery. Participants in the sweat lodge experience expanded spiritual and cultural understanding, feel more in harmony with life, gain increased wisdom, and are better able to follow the good red road. Elizabeth Grobsmith, an expert on the plains Indians, testified that there is support in the literature for the rehabilitative effects of sweat lodge ceremonies for Native American inmates.

Sweat lodges are constructed from willow, are attached to the earth, and contain a fire pit in which rocks are heated. At least three persons typically are present for a sweat, the leader, the fire keeper, and the door keeper. Although sweats are communal activities, there appears to be no reason why a person trained to be a leader, fire keeper, and door keeper could not sweat alone.

There is a group of institutionalized deviants among the Sioux known as the Heyoka society. The Heyokas are "contraries," and act in ways that are the opposite of what their larger Native American communities practice. They will, for example, be humorous when a death occurs in the tribe. Heyokas who are medicine men may conduct their worship services backwards or even act in an irreverent manner during ceremonies. Although Native American worshippers can participate in ceremonies that are conducted, for example, in the opposite direction of what they were taught, such ceremonies do not allow them full religious expression. The official medicine man brought in by the Department to conduct sweat lodge ceremonies and provide spiritual counseling, Elmer Running, is a Heyoka.

During the time relevant to this action, SapaNajin was on protective custody status. He did not know which inmates might be wanting to harm him and was unable to tell prison officials specifically whom they should protect him from. Inmates on PC status are kept isolated from general population inmates for safety and security reasons. This prevents them from participating in most of the usual prison activities,

including Native American cultural and religious gatherings.

SapaNajin made numerous requests to attend sweat lodge, which were denied because of his PC status. He similarly was not permitted to attend meetings of the Native American Cultural and Spiritual Awareness Club. While on PC status he also made requests to be visited by medicine men and filed a grievance concerning the Department's practice of bringing in Running, a Heyoka, to conduct all of the sweat lodge ceremonies. SapaNajin also requested, unsuccessfully, that he be permitted to receive beading materials from the club.

The parties present their first amendment and consent decree arguments in an intertwined fashion, but I shall separate the constitutional claims from the contempt claims because the legal analysis differs. The plaintiff argues that prison officials denied him religious expression allegedly guaranteed by the consent decrees and that the restrictions on his religious expression were unreasonable, and, therefore, violative of the first amendment.

## I. CONSENT DECREE CLAIMS

SapaNajin contends that the Department has failed to comply with the affirmative action and Native American studies provisions of the 1974 consent decree, and has imposed restrictions on religious practices that violate both the 1974 and 1976 decrees. To prevail on his contempt claim, SapaNajin must show by clear and convincing evidence that the defendant violated the consent decrees. *Kansas City Power & Light Co. v. National Labor Relations Board*, 137 F.2d 77, 79 (8th Cir.1943); *Washington-Baltimore Newspaper Guild, Local 35, of the Newspaper Guild, AFL–CIO–CLC v. Washington Post Co.*, 626 F.2d 1029, 1031 (D.C.Cir.1980). In this case SapaNajin argues not only that the defendant violated the decrees, but also that he is entitled to recover compensatory damages from the defendant.

At the onset, I note that the consent decrees do not discuss special custody inmates, such as those on PC status. Nothing in the decrees suggests that Native American inmates on PC status are to receive special treatment not accorded to other inmates in the PC unit.

## A. AFFIRMATIVE ACTION

■ Paragraph 5 of the 1974 consent decree provides that:

The defendant and plaintiffs' counsel shall formulate an affirmative action hiring plan designed to locate job applicants and to secure employment and training by the defendant of qualified Indian personnel, recognizing the unique cultural needs of Indian inmates.

Filing 48. The Department did develop a plan—an ambitious one, *see* exhibit 43 (Nebraska Department of Correctional Services Equal Employment Opportunity Program, 1975)—and has continued to develop affirmative action guidelines. *See* exhibits 44 (1980), 45 (1986). The Department certainly has "formulate[d] an affirmative action hiring plan," and there is no evidence that it is not "designed to locate job applicants and to secure employment and training by the defendant of qualified Indian personnel...." The defendant clearly has complied with the letter of the consent decree. Despite the plaintiff's contentions to the contrary, I find that the defendant also has complied with the spirit of paragraph 5.

The 1975 affirmative action plan had as its goal the hiring of a total of 22 Native American employees, a number that roughly correlates with the percentage of Native American inmates in the prison population, but is far in excess of the percentage of Native Americans in the Nebraska work force. The data presented by the defendant show that the percentage of Native American employees employed by the Department during recent years exceeds that of the Nebraska labor force generally. *See* exhibits 46, 47. That the Department was unable to secure 22 Native American employees does not show noncompliance with the spirit of the consent decree in light of the evidence presented at trial, which established that the Department, along with the Nebraska Department of Personnel,

has made appropriate and regular efforts to attract Native American employees.

The Department ensures that numerous Native American organizations are informed of job openings, advertises at job fairs, and has used recruiting trips to reservations. The plaintiff suggests that failure to advertise on minority radio stations, to state on mailings that the Department has an affirmative duty to hire Native Americans, and to continue making regular recruiting trips demonstrates disregard for the directive of the consent decree. I disagree. The overall efforts of the Department reflect a commitment to finding and hiring qualified Native American applicants, and demonstrate compliance with the consent decree.

## B.  NATIVE AMERICAN STUDIES

During the years immediately following the 1974 consent decree, the Department contracted with Northeast Technical College for Native American studies courses. Northeast provided a certificate program in Native American studies for inmates until 1978, when the Department selected Southeast Community College (SECC) to assume responsibility for inmate education. Prior to 1978, regular and varied Native American courses were available to inmates. Inmates were involved in course selection and content, and assisted in suggesting instructors for the classes. After SECC took over the inmate education program, officials sought inmates' input less often; by about 1982 inmates essentially had no involvement in planning courses or suggesting instructors for the Native American Studies program.

The number and variety of Native American studies courses offered to inmates have decreased in recent years. Exhibit 48. SECC offers neither a degree nor a certificate in Native American studies. Inmates enrolled at SECC who desire a degree must choose between a business degree or one of seven vocational skills programs and may take Native American studies as electives. The SECC program is accredited, but operates on a quarter system, which makes it difficult for students later to transfer their

credits to the University of Nebraska, which is on a semester system. PC inmates cannot participate in the Native American studies courses, and are offered only correspondence courses (not including Native American studies) or GED and non-credit college skills preparation courses.

Paragraph 7 of the 1974 decree provides that:

> The defendants will offer accredited courses in Indian studies at the Nebraska Penal and Correctional Complex within a reasonable time after the effective date of the Order. The plaintiffs will aid the defendant in obtaining personnel, materials, and financial resources, as well as aiding in the formulation of the course subject matter.

Filing 48. "[A]ccredited courses in Indian studies" were available "within a reasonable time after the effective date" of the 1974 consent decree. Accredited courses in Native American studies presently are offered from time to time for general population inmates although there currently is no certificate or degree program. PC inmates are not offered Native American studies courses, but may obtain books and videotapes on Native American issues through interlibrary loan for use in the PC unit.

Although there has not been a violation of the consent decree, the current condition of the Native American studies program is not impressive. In recent years SECC employees and prison personnel have made no effort to involve the inmates in planning Native American studies courses. It appears that little effort has been made to follow up on suggestions or to reemploy teachers who have offered well-attended courses. Officials from SECC and the Department apparently do not work together to maintain or improve the program, an effort that they need to undertake.

## C.  RELIGIOUS ISSUES

The 1974 consent decree provides in paragraph 2:

> In order to meet the religious and spiritual needs of the plaintiff class, defendants shall allow inmates access to Indian medicine men and spiritual leaders and pro-

vide facilities for spiritual and religious services, including but not limited to the Native American Church. Further, defendants will set aside a percent of its budget (that reflects the percent of the Indian inmates in the Penal Complex) which at any given time is allocated for other clergy salaries and expenses attendant to providing services to members of other religious faiths, to payment of fees and expenses attendant to providing Indian religious services or ceremonies. Filing 48.

### 1. Beadwork

Nothing in the consent decree discusses beadwork. While some beadwork may have religious significance, there is no evidence that it is a type of religious service or prayer ritual required by SapaNajin's religion. PC inmates are permitted to do beadwork if they procure their materials according to the prison rules. The plaintiff provides no argument as to how the consent decree allegedly was violated by the official's refusal to transfer materials, at his request, from the club to him in the PC unit.

### 2. Club Activities

By the terms of the 1974 consent decree, prison officials were to "[e]xtend official recognition to an Indian inmate spiritual culture club." Filing 48 at ¶ 4. This they have done. The evidence suggests that prison officials recognize the partially religious nature of this club; club attendance is not, however, part of SapaNajin's religious beliefs. Inmates in the general population are permitted to attend club meetings, and nothing in the consent decree requires that exceptions to the PC rules be made for PC inmates. Contrary to the plaintiff's assertion, the consent decree does not impose a duty to allow Native American PC inmates access to club meetings, which would expose them to the dangers PC status is designed to avoid.

### 3. Sweat Lodge

In the supplemental consent decree of 1976 the parties agreed "that a sweat lodge is a 'facility' for the worship of Indian religion," filing 51 at 1, as contemplated in paragraph 2 of the 1974 consent decree. The parties agreed that:

> The defendants will permit routine access to this sweat lodge at reasonable times to be agreed upon by the parties. The use of the sweat lodge will be available to all inmates subject to the same rules and regulations as govern other religious services, recreational clubs and similar facilities at the Nebraska Penal and Correctional Complex.

Filing 51 at ¶ 2. The Department currently provides seven sweat lodges for inmates at six Nebraska correctional units, including the Nebraska State Penitentiary (two), and the Lincoln Correctional Center (LCC), where the D & E center is located.

While requiring officials to permit access to the sweat lodge, paragraph 2 expressly incorporates the relevant prison rules concerning religious and recreational activities. Thus, denying access to the sweat lodge because of rules restricting the activities of PC inmates is within the terms of the consent decree, and is reasonable under the facts of this case.

### 4. Spiritual Leaders

Prison officials must "allow inmates access to Indian medicine men and spiritual leaders...." Since 1974, prison officials have brought Native American spiritual leaders to the correctional facilities on, approximately, a quarterly basis. The expenses of the visitors often are paid, wholly or in part, with state funds.

SapaNajin's arguments concerning the specific religious beliefs of the "official" medicine man, Elmer Running, raise an important first amendment question, but do not persuade me that there has been a violation of the consent decree. The Department has provided state funds as required by the decree, and ensures that a medicine man is available approximately every four months. The Department permits inmates to bring in medicine men other than Running if the proper procedures are followed. Although PC inmates are not visited regularly by medicine men, there is no evidence that prison officials are responsible for the failure of medicine men to go on the PC unit while they are on

the LCC grounds. The defendant is in compliance with the decree on this issue and all others raised by SapaNajin.

I need not decide the question whether damages can be awarded in a civil contempt proceeding against a state official because SapaNajin has failed to prove that Gunter violated the consent decrees. I must, however, consider whether the restrictions on religious expression complained of by SapaNajin violate the free exercise clause of the first amendment.

## II. FIRST AMENDMENT CLAIMS

"[C]onvicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979). They "enjoy freedom of speech and religion under the First and Fourteenth Amendments...." *Id.* Nevertheless, "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of [inmates'] retained constitutional rights ...," *id.* at 546, 99 S.Ct. at 1878, "including those derived from the First Amendment." *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125, 97 S.Ct. 2532, 2537, 53 L.Ed.2d 629 (1977).

The Supreme Court repeatedly has reminded federal courts that we "do not sit to supervise state prisons." *Meachum v. Fano*, 427 U.S. 215, 228–29, 96 S.Ct. 2532, 2540–41, 49 L.Ed.2d 451 (1976). *See also Shabazz v. O'Lone*, 782 F.2d 416, 431 (3d Cir.1986) (en banc) (Hunter, J., dissenting) (rule of deference applies with same force in first amendment cases), *cert. granted,* — U.S. —, 107 S.Ct. 268, 93 L.Ed.2d 245 (1986). This deference is reflected in the standard set out by the Eighth Circuit for reviewing inmates' free exercise claims.

The inmate "must show that his belief is religious in nature and sincerely held. Additionally, the prisoner must show that the regulation in question does, in fact, infringe upon that belief." *Hill v. Blackwell*, 774 F.2d 338, 342–43 (8th Cir.1985). To defeat an inmate's claim, prison officials

need only "show that the exercise of the challenged religious belief could create a potential threat to a legitimate penological objective." *Id.* at 343. The Eighth Circuit has emphasized that an *actual* threat need not be established. *See Butler-Bey v. Frey*, 811 F.2d 449, 451 (8th Cir.1987). Once prison officials have shown that the religious expression poses a potential threat to penological objectives, an inmate prevails only by presenting "substantial evidence that the prison officials' belief as to the need for the regulation is unreasonable, or that the officials have exaggerated their response...." *Hill* at 343. The district court then "must determine on the record whether the prison officials have indeed shown that the restrictive regulation is justified." *Id.*

### 1. Beadwork and Club Activities

SapaNajin's religious beliefs are sincerely held. They do not, however, require attendance at the Native American Spiritual and Cultural Awareness Club meetings or the making of beadwork. Thus, SapaNajin's complaints about restrictions affecting beadwork and club attendance do not involve infringements on a religious belief and therefore require no additional scrutiny under the first amendment.

### 2. Sweat Lodge

The limitations on sweat lodge attendance seriously infringe on SapaNajin's religious expression. The defendant has, however, offered legitimate penological justifications for denying PC inmates access to sweat lodge ceremonies. The defendant has rational safety and security concerns about permitting PC inmates to participate in activities with general population inmates or to leave the PC unit. These concerns are enhanced in the plaintiff's case because he could not specifically identify the inmates who might pose a danger to him. The evidence regarding the LCC and D & E grounds, and the daily activity patterns supports the concerns expressed by the prison officials. The plaintiff has not shown that the restrictions on sweat lodge participation are an unreasonable or exaggerated response to these concerns.

The plaintiff could not be sure which general population inmates might be wanting to harm him. He testified that he did not fear being with other Native American inmates, yet he has been assaulted by another Native American inmate. SapaNajin argues, however, that he could sweat alone. This would be a complex, staff-intensive solution requiring that SapaNajin be escorted nearly the entire length of the LCC grounds, be guarded during the several hours that he utilized the sweat lodge, and be returned to the PC unit under guard.

■ After considering all the evidence, I conclude that the defendant's safety and security concerns are not unreasonable or exaggerated, and that there is no constitutional basis for requiring prison officials to implement SapaNajin's suggestions for allowing him access to sweat lodge ceremonies while on PC status. The limitations on PC inmates' group religious expression are for the purpose of ensuring inmate safety. I note that, while there exists a possibility of SapaNajin returning to PC status, the evidence presented at trial indicated that SapaNajin would be off PC status within perhaps only a few days after the trial and be able again to attend sweat lodge ceremonies.

### 3. Spiritual Leaders

SapaNajin has carried his burden of proving that the Department's practice of providing only one official medicine man, who is of the Heyoka Society, infringes on his religious beliefs. He has shown that he brought his concerns to the attention of prison officials. In a December 31, 1985, grievance to William Foster, formerly the assistant superintendent of the D & E center, SapaNajin wrote, in part:

[Running] gave no spiritual counseling and brought no Sacred Pipe, even after being asked about a ceremony, or other materials. This would be natural for him because all indications are that he is Heyoka Society—the contrary, or backwards, medicine society. Which, has power and is fine only for those of its following, or ignorant of its ways. Traditionally they

are the exception not the rule and, in any event, the Heyoka Way is not my ways.

\* \* \* \* \* \*

In sum, I am denied access to Medicine Men of my choice, on top of being denied access to purification rites (Sweatlodge).... Thus I receive no religious services what-so-ever and my attempts to resolve this are ignored by Ken Bordeaux and/or denied by this administration.

Exhibit 29. Foster's response, in part, read: "It has been determined that by the Department of Correctional Services, Elmer Running is the official Medicine man for Nebraska's prisons." *Id.* There is no evidence that Bordeaux, the Native American religious coordinator, or any other prison official investigated or sought to remedy the problem identified by SapaNajin.

■ The defendants have not shown any legitimate penological justification for having Elmer Running be the only official medicine man for the Department. Therefore the plaintiff does not bear the additional burden of proving that the policy is an exaggerated response. He has established a violation of his first amendment rights. This is not to say that each inmate is entitled to his own individual spiritual leader. There is a middle ground between that extreme and the present practice of repeatedly providing only one religious perspective. By providing one or two other medicine men on a rotating basis the Department could better meet the religious needs of many Native American inmates. Gunter ultimately is responsible for Department policy and has been aware of the policy and practice of providing only Elmer Running as the official medicine man for the Nebraska correctional institutions. Although Gunter prevails on each of the other claims, SapaNajin is entitled to declaratory and injunctive relief on his first amendment claim regarding the Department's medicine man access policy.

### ORDER

For the reasons stated in the accompanying memorandum,

IT IS DECLARED that the defendant's practice of providing only one official medicine man who is known to have beliefs and practices contrary to those of the plaintiff and of other Native American inmates violates the plaintiff's right to freedom of religious expression as guaranteed by the first amendment.

IT IS ORDERED that the defendant ensure that a medicine man or medicine men are provided in a manner that reasonably accommodates the religious beliefs of the plaintiff; a specific plan for doing so shall be presented to the plaintiff and the court within 30 days of the date of this order.

IT FURTHER IS ORDERED that judgment be entered for the defendant as to the remaining first amendment claims and all of the consent decree claims.